[Cite as *State v. Fears*, 2017-Ohio-6978.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 104868**

---

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# LONNIE K. FEARS

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-602367-A

**BEFORE:** McCormack, J., Keough, A.J., and Stewart, J.

**RELEASED AND JOURNALIZED:** July 27, 2017

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
2077 East 4th Street, 2nd Floor
Cleveland, OH 44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Glen Ramdhan
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH   44113

TIM McCORMACK, J.:

**{¶1}** Plaintiff-appellant Lonnie K. Fears appeals from his conviction for two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4). For the reasons that follow, we affirm.

Procedural History

**{¶2}** On January 6, 2016, Fears was charged under a multiple-count indictment pertaining to acts committed between January 2015 to April 2015, against his stepdaughter, J.H., who was seven years old at the time of the charged acts. The indictment charged as follows: Count 1 — gross sexual imposition ("GSI") in violation of R.C. 2907.05(A)(4) (alleging touching of the vagina); Count 2 — GSI in violation of R.C. 2907.05(A)(4) (alleging touching of the breasts); Count 3 — kidnapping in violation of R.C. 2905.01(A)(4); Count 4 — GSI in violation of R.C. 2907.05(A)(4) (alleging touching of the vagina); Count 5 — GSI in violation of R.C. 2907.05(A)(4) (alleging touching of the breasts); and Count 6 — kidnapping in violation of R.C. 2905.01(A)(4).

**{¶3}** Prior to commencement of trial, the court conducted voir dire of J.H., who was eight years old at the time of trial, and found J.H. to be competent to testify. Additionally, having been advised that a witness, namely J.H.'s mother, W.F., planned to assert her Fifth Amendment privilege against self-incrimination, the court held an Evid.R. 104 hearing in order to address preliminary questions concerning the existence of privilege. Following voir dire, the court found no Fifth Amendment privilege applied,

specifically regarding the prosecutor's questions concerning W.F.'s involvement in a change to J.H.'s testimony. The case proceeded to trial on June 22, 2016.

{¶4} After the close of the state's case, defense counsel moved for Crim.R. 29 acquittal. The trial court granted the defense motion as it related to Counts 2 and 5, and it dismissed those charges. After deliberation, the jury found Fears guilty of Counts 1 and 4 and not guilty of Counts 3 and 6. The court sentenced Fears to two years of community control sanctions with GPS monitoring and labeled Fears a Tier II sexual offender.

{¶5} Fears now appeals, assigning the following errors for our review:

I. The trial court erred in allowing the state to present inadmissible hearsay at trial.

II. Defense counsel was ineffective for failure to object to the admission of inadmissible hearsay.

III. Insufficient Evidence supported Appellant's convictions.

IV. The manifest weight of the evidence did not support Appellant's convictions.

Evidence at Trial

{¶6} At trial, the state presented the following witnesses: J.H.; J.H.'s mother, W.F. Fears; therapist/case manager Felicia Coffman; child sex abuse investigator Shannon Sneed; and Detective Frankie Reed. Fears testified on his own behalf and also offered the testimony of his mother-in-law, M.G.

{¶7} Between January and April 2015, J.H. lived with Fears (her stepfather) and Fears's mother, "Grandma Margaret." J.H.'s mother, W.F., and W.F.'s other two children, lived in a different residence with W.F.'s mother, M.G. According to both Fears and W.F., J.H. lived with Fears in order to receive the benefit of a better school system in the district where Fears resided. Prior to 2015, J.H. lived with Fears and her mother in Hawaii.

{¶8} Felicia Coffman, a therapist case manager with Beech Brook, testified on behalf of the state. Coffman testified that as a therapist, she performs mental health diagnostic assessments of the children in order to determine what problems are presenting and to give families a diagnosis. Further, she develops treatment plans to work with children "to decrease their mental health symptoms."

{¶9} Coffman testified that she met with J.H. and J.H.'s mother in September 2015. Rainbow Babies and Children's Hospital referred J.H. to Beech Brook for behavioral concerns, including "impulsivity, inattention and hyperactivity, defiance, and some anxious behavior." As part of the standard assessment of children who are referred to her, Coffman asked J.H. general questions concerning the child's present health, health history, school and home functioning, and relationships with others, as well as questions concerning "possible traumatic events such as physical abuse, sexual abuse, emotional abuse, [and] neglect."

{¶10} Coffman met with J.H. and her mother for three "very thorough" one-hour sessions for assessment purposes. Coffman stated that during these sessions, J.H. was

always "well-dressed, very clean, very well-mannered." Coffman testified that during the global assessment in which she questioned the child regarding any "traumatic history," she asked J.H. if anyone had ever touched her private sexual body parts and J.H. "said yes, that her stepfather had massaged her privates and she made a motion with her hand towards her vagina." Coffman further testified that J.H. told her that this had happened on one occasion and it occurred underneath her clothes. Coffman asked J.H. if she had told her mother, and J.H. replied that she had. At that point, Coffman stated, she stopped the assessment and advised J.H.'s mother that she is required to report the alleged incident to children's services.

{¶11} After the initial intake assessments, Coffman continued to meet with J.H., as well as her family, for eight additional sessions, in which they met for half-hour individual sessions as well as half-hour family sessions. Coffman testified that during the additional sessions, they discussed "behavioral interventions that could help J.H. at home and individually." Coffman also stated that she was working with J.H. "on slowing down decision-making, focusing, concentrating, being able to connect her thoughts, feelings, behaviors to stressors, and also coping skills." Coffman explained that at this point in time, her purpose for continuing to meet with J.H. was to help her "express [her] feelings and cope and deal with feelings." Coffman noted that during these additional sessions, J.H. discussed her fear of sleeping in the dark and worries concerning making friends. If J.H. had mentioned any sexual abuse at this time,

however, Coffman stated that she would have "focused [on J.H.'s] feelings and her thoughts about it."

{¶12} Finally, Coffman testified that there was never any mention by J.H. or family members, during the initial intake sessions or the additional family/individual sessions, of any issues with J.H.'s urinating on herself or needing help using the bathroom or taking a bath. She stated that if there was such a concern, that would be something that would be revealed during an assessment.

{¶13} Shannon Sneed is employed as a child sex abuse investigator with the Cuyahoga County Division of Children and Family Services. Sneed testified that when she receives a case, she initially evaluates the child's safety to determine whether the alleged perpetrator has access to the child. Sneed then meets with the child and the child's family members. Sneed testified that, thereafter, she assesses the case in order to determine whether "the child is safe * * *, if they need to see a doctor, if they need to go to the hospital, what services would they benefit from." She also stated that she would determine whether the case should be closed or whether ongoing services are needed. Sneed testified that in conducting interviews with the children and family where there has been a disclosure of abuse, "it is very important that we refer to a doctor for counseling." She noted that in some cases, however, the children have already been to a hospital or have had counseling.

{¶14} Sneed testified that once she has evaluated the child, she then makes a disposition of "unsubstantiated, indicated, or substantiated." At that point in time, if the

department finds a sex abuse allegation is "substantiated" or "indicated," they are required to contact law enforcement. Sneed stated that while it is necessary to report an allegation of a crime against children to law enforcement, her primary purpose in meeting with the children is for medical diagnosis and treatment and to ensure the children's safety.

{¶15} Sneed received a referral in October 2015 from J.H.'s therapist at Beech Brook. Upon receiving the referral, Sneed met with J.H. and her mother at their home. Sneed informed W.F. why she was there. Sneed stated that W.F. was aware of the allegations and she permitted Sneed to meet with J.H. alone. Sneed stated that J.H. also knew why Sneed was talking to her, stating that J.H. told her it was "from what I told Ms. Felicia."

{¶16} Sneed testified that J.H. then told her that "her stepdad was touching her private parts" and that "he was rubbing the part that sticks out of my private part." Sneed stated that she inquired further:

> I asked her where did this happen and she told me at his mom's house in [her uncle's] bedroom. She told me that he would lay her on the bed and that's when he would pull down her pants and rub on her private area.
>
> * * *
>
> She told me — when I asked her * * * if it was once or more than once * * * she said more than once. She was not able to give me an exact number of how many times, but she said more than once.
>
> * * *
>
> She said that she told her mom because her private parts started hurting so she needed to — she knew she needed to tell mommy.

* * * Then she said that once she told her mom, that [her mom] put a stop to it.

**{¶17}** Sneed stated that when she told J.H. that she would need to talk to a police officer, J.H. became very upset and said that she did not want her stepfather to go to jail. Sneed testified that she could "see * * * the worry on her face." When Sneed advised J.H.'s mother what J.H. had disclosed to her and that Sneed felt it was necessary to file a police report "right then and there," W.F. appeared surprised.

**{¶18}** After meeting with J.H., interviewing Fears, and speaking with J.H.'s therapist, Sneed completed a "family assessment" and concluded in her case disposition that the allegations of inappropriate touching were "indicated." At this point, Sneed had no further involvement in the case. Sneed testified that while it is within her responsibilities to recommend therapy after receiving disclosures of this nature, J.H. was already receiving therapy at that time.

**{¶19}** After meeting with J.H., Sneed, W.F., and J.H. went to the police station, where J.H. met with Detective Frankie Reed. Detective Reed testified that what J.H. told him was consistent with what the social workers had told him. During her testimony, Sneed testified that she reviewed the police report concerning the allegations against Fears, and she learned that J.H.'s statement to the police was consistent with what J.H. told both her and Coffman.

**{¶20}** J.H. testified that she lives with her mother and her two siblings; however, previously, she lived with her mother and stepfather in Hawaii and then with her

stepfather and Grandma Margaret, Fears's mother, in Ohio. J.H. stated that Fears took care of her while she lived with him. He made her breakfast, taught her how to tie her shoes, and allowed her to play games on the Xbox when she had good days.

{¶21} J.H. testified that she considers herself a big girl, she uses the bathroom on her own, she does not need help with wiping or using the bathroom, and she does not have bathroom accidents. She also stated that both Fears and Grandma Margaret would help her with bathing and that this would take place in the bathroom. She testified that Fears would "wash all over" her when he was giving her a bath, including her "private area." She stated that this would take place in the bathroom.

{¶22} When the prosecutor asked J.H. if Fears ever massaged her, J.H. replied that "[u]sually he would give me a real massage," explaining that Fears would massage her back, stomach, and the middle of her chest. The prosecutor asked J.H. if Fears ever wiped her in any place other than the bathroom, and the transcript shows that before responding, J.H. looked at Fears and said, "no." J.H. explained that Fears would use a wash cloth and soap to wash her in the bathroom if she "got very dirty playing outside" and that she would never be allowed to go to bed without taking a bath.

{¶23} When the prosecutor asked J.H. if she remembered Felicia Coffman or the questions Coffman asked, J.H. told the prosecutor that she remembered Coffman but she did not remember the questions Coffman asked her. J.H. stated that she remembered asking Coffman why she could not see her stepfather, and she then admitted on the stand

that she was afraid that if she said certain things, she would not be able to see Fears. She explained that what she told Coffman "got all mixed up."

{¶24} Eventually, J.H. testified that she remembered telling Coffman that Fears would wash her private area in the bedroom. She explained that she would be wearing her school clothes that were "very, very dirty" and she would be lying on the bed while Fears was kneeling on the floor next to her. She testified that he would wash her with a wash cloth and then he would use his hands to apply lotion "all over my body," "around my body," and "on my private area." She stated that it would not take very long, usually shorter than a minute; it occurred "two or three times"; it occurred when she arrived home from school, around 3:00 p.m.; and no one else was home during this time. J.H. said that afterwards, she would take a little nap, stating that "sometimes I would fall asleep and then he would pull me under the covers. * * * [H]e would sometimes tuck me in." She testified that it was too early for her to be going to bed and that her normal bedtime was 8:00 p.m. During this testimony, the transcript reflects that on at least two additional occasions, J.H. would look at Fears when answering the prosecutor's questions. During this testimony, J.H. also testified that she remembered telling Coffman and Detective Reed that Fears massaged her vagina.

{¶25} When the prosecutor asked J.H. if her mother told her to change what she originally told Coffman, J.H. said "yes," and she explained that she is now saying in court that Fears was "just washing" her because she does not want to get Fears in trouble and she became "mixed up":

Q:   J.H., you mentioned when your mom was telling you things she said that you were mistaken.   Is that right?
A:   Yes.
Q:   What were you mistaken about?
A:   About what he did.
Q:   What did you initially think he did?
A:   I thought he was washing my privates as well but then for a little while I had thought it was something different because it got mixed up.
Q:   * * * If it wasn't washing, what was the different thing you thought it was?
A:   I thought he was massaging my private area, which he wasn't.
Q:   Okay, but you're saying that because your mom told you [that] you were mistaken?
A:   Yes.

* * *

Q:   * * * [Y]ou've talked to your mom about * * * what to say here?
A:   Yes.
Q:   Did your mom tell you what to say?
A:   Yes.
Q:   Did your mom tell you what to say to Felicia Coffman?
A:   No.
Q:   Did your mom tell you what to say to Shannon Sneed?
A:   No.
Q:   Did your mom tell you what to say to Detective Reed?
A:   No.
Q:   But your mom told you what to say here in court?
A:   Yes.

{¶26} On redirect examination, J.H. confirmed that her mother was the one who told J.H. that J.H. was "mistaken" when she said that Fears was massaging her private area.   However, J.H. testified that she told Coffman, Sneed, and Detective Reed the truth.   When the court asked J.H. why her mother would tell her to change her story, J.H. replied, "So my father could come home."

**{¶27}** W.F. testified that she learned in April 2015 that J.H. had been inappropriately touched by Fears. W.F. stated that she learned this information in the ordinary course of having general conversations with her daughter regarding inappropriate touching and that this type of conversation is something she, as a parent, regularly had with her daughter. W.F. testified that when J.H. told her about Fears washing J.H. with a washcloth, she explained to her daughter that this type of touch was not inappropriate. She admitted that J.H. had provided more detail to the social worker and the police regarding Fears's actions outside of her mother's presence. W.F. claimed that J.H. kept changing her statements, "adding things" and "taking things away," and she attributed J.H.'s apparent confusion between appropriate and inappropriate touching to J.H.'s psychological issues. In response to what she had learned from J.H. about Fears's actions, W.F. instructed Fears to stop bathing J.H.

**{¶28}** W.F. also testified that J.H. has difficulty wiping herself properly and that she is afraid to flush the toilet. She stated that she shared this information with J.H's therapist from Beech Brook. She also stated that she asked personnel from Bellefaire Connections, an after-school hospitalization program that J.H. attended, to write a letter addressing J.H.'s hygiene concerns. The letter (State's exhibit No. 5), however, notes only that W.F. has reported that J.H. struggles to bathe herself and she does not wipe her private areas after using the restroom.

**{¶29}** M.G., W.F.'s mother, testified on behalf of the defense. She testified that J.H. is "terrified of the toilet flushing" and she needs help wiping properly in the

restroom. On cross-examination, however, she stated that this type of personal hygiene issue is not something that requires medical attention, either from a doctor or a counselor. M.G. explained that "[t]his is a family matter * * * and is not something that you just broadcast to everyone * * *." M.G. also stated that if someone was having this type of personal hygiene issue that such issue would be addressed in a restroom, rather than a bedroom.

{¶30} Lonnie Fears testified on his own behalf. He stated that when J.H. was at his home, he would be J.H.'s primary caregiver. His mother would help with J.H.'s care when she was home. Fears's mother worked one job from 8:30 a.m. until 5:00 p.m. and another job from 5:30 p.m. until 9:00 p.m. Fears testified that the only time he would touch J.H. was "to clean her because she was dirty." He stated he did not know how it would get done if he did not clean her.

{¶31} On cross-examination, Fears testified that he has given J.H. massages on her back, shoulders, and stomach in the bedroom. He stated that J.H. had eczema and he would apply medicated lotion on her body, including her vagina, typically after every bath or when she had an outbreak or when he was attempting to prevent an outbreak. He could not remember the name of the medication. Fears explained that he did not report this to Detective Reed because he believed that Detective Reed already had "an understanding of [J.H.'s] medical history" from speaking with his wife and the social worker.

**{¶32}** According to Fears, when J.H. would come home from school, she would smell of feces and urine.  J.H.'s school never informed him, however, that she had any bathroom issues during the school day.  Fears stated that he would "[g]et a wash rag, some soap, and handle it."  Typically, he would tell J.H. that "we need to take care of this," and J.H. would go to her bedroom while he retrieved the washcloth and the soap from the bathroom.  Fears then would clean J.H.'s vagina with the washcloth.  She would then pull up her pants and watch cartoons.  He denied having J.H. take a nap after school.

**{¶33}** Fears testified that, despite the underwear being dirty with feces and urine, he would place the same underwear back on J.H., explaining that "[m]y wife would only give me one change of clothes for her for the day."  While he acknowledged that he had a washing machine in his house, he stated, "[W]hat am I going to do?  Stay there for X amount of time just to wash one pair of underwear that she has thousands of them to change — to change back into if I just go ten minutes away?"  And despite the fact that J.H.'s accidents would occur "every once in a while," he "just didn't think of" ensuring there was extra underwear in the house.  He stated that it "didn't cross [his] mind" to go to the store to buy extra underwear for J.H.

**{¶34}** Fears also testified that J.H.'s personal hygiene issues were never reported to a doctor or counselor.  He stated that while the issue was a big problem in the family, it was embarrassing and not something "I would just go out and broadcast."

Hearsay Evidence

**{¶35}** In his first assignment of error, Fears contends that the trial court erred when it allowed the testimony of Felicia Coffman and Shannon Sneed to the extent that this testimony included J.H.'s statements to them about allegations of sexual abuse. Fears argues that this testimony was extrinsic evidence of prior inconsistent statements that was used to impeach J.H. and does not fall within any hearsay exception.

**{¶36}** Hearsay is an out-of-court statement offered for the truth of the matter asserted. Evid.R. 801(C). Hearsay is inadmissible unless it falls within a specific exception outlined in the rules of evidence. Evid.R. 802. Statements made for the purposes of medical diagnosis and treatment "are a clearly defined, long-standing exception to the rules of hearsay." *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 27. Evid.R. 803(4) allows for the admission of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Additionally, "'courts have consistently found that a description of the encounter and identification of the perpetrator are within [the] scope of statements for medical treatment and diagnosis.'" *Echols*, quoting *In re D.L.*, 8th Dist. Cuyahoga No. 84643, 2005-Ohio-2320, ¶ 21, citing *State v. Stahl*, 9th Dist. Summit No. 22261, 2005-Ohio-1137, at ¶ 15; *State v. Richardson*, 12th Dist. Clermont Nos. CA2014-03-023, CA2014-06-044 and CA2014-06-045, 2015-Ohio-824, ¶ 36.

**{¶37}** In sexual assault cases involving young victims, there is often testimony from a child advocacy social worker. And courts have acknowledged the "dual role" — medical diagnosis/treatment and investigation/gathering of evidence — of social workers who interview a child who may be the victim of sexual abuse. *See State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 33. Only those statements made for the purpose of diagnosis and treatment are admissible under Evid.R. 803(4). *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 46 (regardless of whether a child less than ten years old has been determined to be competent to testify, the child's statements may be admitted at trial as an exception to the hearsay rule if they were made for purposes of medical diagnosis or treatment); *State v. Goza*, 8th Dist. Cuyahoga No. 89032, 2007-Ohio-6837, ¶ 39. Social workers are oftentimes in the best position to help determine the proper treatment for the minor, which treatment includes determining which home was free of sexual abuse. *State v. Durham*, 8th Dist. Cuyahoga No. 84132, 2005-Ohio-202, ¶ 33, citing *Presley v. Presley*, 71 Ohio App.3d 34, 39, 593 N.E.2d 17 (8th Dist.1990).

**{¶38}** To the extent a victim's statement to a social worker is for investigative or prosecutorial purposes, the statement will not fall within the hearsay exception under Evid.R. 803(4). *See State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 42. The fact that the information initially gathered by the social workers was subsequently used by the state in its prosecution, however, does not change the fact that these statements were not made for investigative or prosecutorial purposes.

*Muttart* at ¶ 62. Trial courts are entrusted with recognizing the point at which nontestimonial (admissible under Evid.R. 803(4)) statements become testimonial (falling outside the hearsay exception). *See Davis v. Washington*, 547 U.S. 813, 828, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

**{¶39}** Moreover, the testimony regarding a young victim's statement to social workers is admissible regardless of whether the statements "are consistent or inconsistent with the victim's trial testimony." *State v. Freeman*, 8th Dist. Cuyahoga No. 92809, 2010-Ohio-3714, ¶ 49, citing *Durham*.

**{¶40}** A trial court has broad discretion in admitting or excluding evidence, and a trial court's ruling on the admissibility of evidence will be upheld absent an abuse of that discretion. *In re C.A.*, 8th Dist. Cuyahoga No. 102675, 2015-Ohio-4768, ¶ 59. An abuse of discretion implies that the court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶41}** Here, Felicia Coffman testified that she is a therapist case manager at Beech Brook. As a therapist, she performs mental health diagnostic assessments of children in order to determine what problems the child is presenting and to provide the family with a diagnosis. She also develops treatment plans for the children in order that the children may "decrease their mental health symptoms."

**{¶42}** With respect to J.H., Coffman testified that she met with J.H. as a result of a referral from the children's hospital in order to address behavioral concerns such as

impulsivity, inattention, hyperactivity, and defiance. In the course of her assessment, Coffman inquired about any possible traumatic events in J.H.'s life, including sexual abuse. In response to her question, J.H. disclosed that her stepfather massaged her private parts. Coffman testified that after J.H.'s disclosure during the initial intake assessment, Coffman continued to meet with J.H. in order to devise a treatment plan that would address J.H.'s behavior and help J.H. "express [her] feelings and cope and deal with feelings."

{¶43} In light of the foregoing, we find J.H.'s statements to her therapist were made primarily for the purpose of medical diagnosis and treatment. Coffman evaluated J.H. in order to properly address and diagnose J.H.'s mental health/behavioral issues, and she continued her evaluation in order to implement a means by which J.H.'s mental and emotional needs may be met. The statements are therefore admissible under the hearsay exception outlined in Evid.R. 803(4).

{¶44} Sneed testified that she is a child sex abuse investigator and her primary purpose in meeting with children when there is an allegation of sex abuse is for medical diagnosis and treatment, in addition to ensuring the children's safety. Sneed testified that one of the first things she does when she meets with the child and the child's family is evaluate the child's safety to determine whether the alleged perpetrator has access to the child. She then determines whether the child is in need of a doctor, a counselor, or a hospital. Sneed testified that "it is very important that we refer to a doctor for

counseling." If she finds that an allegation is substantiated or indicated, Sneed is required to report the allegation to law enforcement.

{¶45} Upon review, we find that the statements made by J.H. to Sneed were made for the purposes of medical diagnosis and treatment as those statements were made as Sneed was endeavoring to determine whether sexual abuse was indicated, whether J.H. remained at risk, and whether J.H. would require treatment. *See In re C.C.*, 8th Dist. Cuyahoga Nos. 88320 and 88321, 2007-Ohio-2226, ¶ 46. The determination regarding whether the alleged perpetrator has access to the child victim necessarily involves a treatment plan insofar as it ensures the child is free of the abuse. *Durham*, 8th Dist. Cuyahoga No. 84132, 2005-Ohio-202; *Presley*, 71 Ohio App.3d 34, 593 N.E.2d 17. The fact that Sneed did not, in fact, refer J.H. to counseling does not alter her initial purpose in meeting with J.H. J.H.'s statements to Sneed are therefore admissible under the Evid.R. 803(4) hearsay exception.

{¶46} Accordingly, we find the trial court did not abuse its discretion in allowing the admission of J.H.'s statements to Coffman and Sneed. Fears's first assignment of error is overruled.

Ineffective Assistance of Counsel

{¶47} In his second assignment of error, Fears contends that defense counsel was ineffective for failing to object to the admission of the testimony of Shannon Sneed where Sneed testified regarding an alleged incident in Hawaii.

**{¶48}** In order to establish a claim of ineffective assistance of counsel, the defendant must show that his trial counsel's performance was deficient in some aspect of his representation and that deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Counsel's performance will be considered deficient only when that performance falls below an objective standard of reasonableness. *Strickland* at 688.

**{¶49}** In order to show prejudice, a defendant must demonstrate that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *State v. Geraci*, 8th Dist. Cuyahoga Nos. 101946 and 101947, 2015-Ohio-2699, ¶ 12. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland* at 694.

**{¶50}** Here, Fears argues on appeal that Sneed's testimony included statements from J.H. regarding an "unindicted incident that allegedly occurred in Hawaii where [Fears] was naked in bed * * *; that [Fears] allegedly 'rubbed' a part that stuck out of her private area * * *; and that she allegedly felt she needed to tell somebody because her private part 'started hurting.'" Upon review of the transcript, however, we note that Fears has misconstrued Sneed's testimony.

**{¶51}** During her testimony, Sneed explained that she asked J.H. if she knew why Sneed was meeting with her, and J.H. indicated the reason was "from what I told Ms. Felicia." Immediately thereafter, Sneed's testimony continued as follows:

Q: What else did you learn from J.H.? What did she tell you?

A: She told me that she told Ms. Felicia that her stepdad was touching her private parts.

Q: Were those her exact words to you?

A: Yes.

Q: What else did she say, if anything?

A: She– her exact quote was * * * [h]e was rubbing the part that sticks out of my private part.
* * *

Q: Did you ask her further questions about that?

A: Yes.

Q: What did you learn?

A: I asked her where did this happen and she told me at his mom's house in [the] bedroom. She told me that he would lay her on the bed and that's when he would pull down her pants and rub on her private area.

Q: Okay. Did she tell you anything else?

A: * * * I asked her if it was once or more than once and she said more than once. * * *

Q: What else did you learn, if anything?

A: * * * She said that she told her mom because her private parts started hurting so she needed to — she knew she needed to tell mommy.

Q: What happened next?

A: Then she said that once she told her mom that she put a stop to it. Those were her exact words.

Q: And then what?

A: And then * * * I asked her if he's ever done this before and she said when they were in Hawaii and that they would both be naked in the bed and he would massage her.

{¶52} At this point, defense counsel objected, and the court overruled the objection. Thereafter, the prosecutor asked Sneed what happened next and Sneed testified that she asked J.H. if she told her mother about Hawaii and J.H. replied that she was not sure "because he would massage her and then she would fall asleep."

{¶53} First, we note that it is evident from the foregoing that Sneed's testimony regarding Fears "rubbing the part that sticks out of my private part" and J.H. needing to

tell her mother because "her private parts started hurting" did not pertain to Sneed's statement concerning the alleged incident in Hawaii. Rather, Sneed's testimony regarding Hawaii concerned J.H.'s response to Sneed asking J.H. if Fears has "ever done this before," and this question was posed after J.H.'s initial statements. At that point, defense counsel did, in fact, object.

{¶54} Moreover, we find that Fears fails to demonstrate that the statement regarding the purported incident in Hawaii changed the outcome of the proceeding. In addition to Sneed's foregoing testimony, J.H.'s therapist testified that J.H. told her that Fears massaged her privates underneath her clothes, and Detective Reed testified that J.H.'s statements to him were consistent with what her therapist and Sneed told him. Additionally, at trial, J.H. testified that Fears gave her "real" massages, and Fears admitted that he massaged J.H. in the bedroom. J.H. also testified that she told Coffman that Fears would wash her with a washcloth, apply lotion with his hands all over her body, including her private area, and he would do this in the bedroom. Although J.H. testified on the stand that Fears only washed her, not massaged her, she admitted that she changed her testimony after her mother advised her that she was "mistaken" and J.H. did not want to get Fears in trouble. Furthermore, J.H. testified that she told Coffman, Sneed, and Detective Reed "the truth," and her mother did not tell her what to say to them.

{¶55} In light of the above, we find no merit to Fears's claim of ineffective assistance of trial. His second assignment of error is therefore overruled.

Sufficiency and Manifest Weight

**{¶56}** In his third and fourth assignments of error, Fears contends that his convictions were not supported by sufficient evidence and his convictions were against the manifest weight of the evidence.

**{¶57}** When assessing a challenge of sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

**{¶58}** While the test for sufficiency of the evidence requires a determination whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion. *Thompkins* at 390. Also unlike a challenge to the sufficiency of the evidence, a manifest weight challenge raises a factual issue.

"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way

and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."

*Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A finding that a conviction was supported by the manifest weight of the evidence, however, necessarily includes a finding of sufficiency. *State v. Howard*, 8th Dist. Cuyahoga No. 97695, 2012-Ohio-3459, ¶ 14, citing *Thompkins* at 388.

{¶59} "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. When examining witness credibility, "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶60} Although the reviewing court considers the credibility of witnesses in a challenge to the manifest weight of the evidence, it does so "with the caveat that the trier of fact is in the best position to determine a witness' credibility through its observation of his or her demeanor, gestures, and voice inflections." *State v. Campbell*, 8th Dist. Cuyahoga Nos. 100246 and 100247, 2014-Ohio-2181, ¶ 39. "'Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest

weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility.'" *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, ¶ 56, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997).

{¶61} A factfinder is free to believe all, some, or none of the testimony of each witness appearing before it. *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18.

{¶62} Fears was convicted of two counts of gross sexual imposition in violation of R.C. 2907.05(A)(4), which provides that no person shall have sexual contact with a child less than 13 years of age. "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). Fears contends that the state failed to present sufficient evidence that he acted with the purpose of sexual gratification.

{¶63} Although the Ohio Revised Code does not define "sexual arousal" or sexual "gratification," R.C. 2907.01(B) "'contemplate[s] any touching of the described areas which a reasonable person would perceive as sexually stimulating or gratifying.'" *State v. Tate*, 8th Dist. Cuyahoga No. 98221, 2013-Ohio-370, ¶ 18, quoting *State v. Astley*, 36 Ohio App.3d 247, 250, 523 N.E.2d 322 (10th Dist.1987); *see also In re Anderson*, 116 Ohio App.3d 441, 443, 688 N.E.2d 545 (12th Dist.1996).

**{¶64}** As an essential element of the offense of gross sexual imposition, the state must present sufficient evidence that the contact was for a sexual purpose. However, "'there is no requirement that there be direct testimony regarding sexual arousal or gratification.'" *Tate* at ¶ 19, quoting *State v. Meredith*, 12th Dist. Warren No. CA2004-06-062, 2005-Ohio-2664, ¶ 13.

**{¶65}** In determining whether sexual contact occurred, the trier of fact may infer from the evidence presented at trial whether the defendant's contact with the areas of the body outlined in R.C. 2907.01 was for the purpose of sexual arousal or gratification. *Tate*; *State v. Cobb*, 81 Ohio App.3d 179, 185, 610 N.E.2d 1009 (9th Dist.1991). The purpose of the contact may be inferred from the type, nature, and circumstances of the contact. *Tate* at ¶ 20, citing *Meredith*; *see also Ohio v. Coleman*, 8th Dist. Cuyahoga No. 102291, 2015-Ohio-4491, ¶ 7 (finding that purpose may also be inferred from the defendant's conduct as well as his or her personality). Accordingly, "[i]f the trier of fact determines that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *Cobb* at 185.

**{¶66}** Here, the state presented the testimony of Beech Brook therapist, Felicia Coffman, who testified that J.H. told her that her stepfather massaged her private parts while simultaneously making a motion with her hand towards her vagina. J.H. told Coffman that this occurred underneath her clothing. Shannon Sneed testified that J.H. told her that her stepfather was touching her private parts and that he was rubbing the part

that sticks out of her private part. Sneed further testified that J.H. told her this occurred in her bedroom more than once. Sneed also testified that J.H. told her mother because her private parts began to hurt. Detective Reed testified that what J.H. told him was consistent with what J.H. had revealed to Coffman and Sneed.

{¶67} J.H. also testified regarding her stepfather's inappropriate touching. Although she stated that after speaking with her mother, she believed she became "mixed up," she testified that what she initially told Coffman, Sneed, and Detective Reed about the touching was "the truth." And J.H. ultimately testified on the stand that she remembered telling Coffman and Detective Reed that Fears massaged her vagina. She also remembered telling Coffman that Fears would wash her private area in the bedroom while she lay on the bed. J.H. stated that Fears would then apply lotion all over her body, including her private area, with his hands. Additionally, J.H. testified the incidents would take place when no one else was home.

{¶68} Viewing the evidence in a light most favorable to the prosecution, we conclude that a rational trier of fact could find that Fears engaged in "sexual contact" on at least two occasions when he touched, massaged, or rubbed J.H.'s vagina, or "the part that sticks out of" her private area. This part of the body constitutes an "erogenous zone" for purposes of R.C. 2907.01(B). Additionally, the manner and circumstances of Fears's contact with J.H., including the fact that Fears "massaged" J.H.'s vagina in the bedroom while no one else was home, was sufficient to allow the jury to infer that Fears's touching of J.H. was motivated by desires of sexual gratification. *Tate*, 8th Dist.

Cuyahoga No. 98221, 2013-Ohio-370, at ¶ 23; *In re Anderson*, 116 Ohio App.3d at 443, 688 N.E.2d 545.   Thus, Fears's conviction of gross sexual imposition was supported by sufficient evidence.

{¶69} Fears also contends that his convictions were against the manifest weight of the evidence.   He claims that his touching J.H. was not for sexual gratification, but rather, he was washing her because she was often dirty with feces and urine.   In support, he argues that J.H.'s testimony was not trustworthy due to the various psychological issues from which she suffered, and the testimony of W.F. and Fears was more credible. As a result, Fears contends, the jury lost its way.

{¶70} Here, the trial court found J.H. competent to testify, which means that the court determined, through questioning, that J.H. is capable of receiving impressions of facts and events and can accurately relate them.   *See State v. Frazier*, 61 Ohio St.3d 247, 251, 574 N.E.2d 483 (1991).   Therefore, regardless of any mental or psychological issues from which J.H. may have suffered, based upon its finding J.H. competent, the court determined that J.H. had an understanding of truth and falsity and she could appreciate her own responsibility to be truthful.   *See State v. Ferrell*, 8th Dist. Cuyahoga No. 92573, 2010-Ohio-1201, ¶ 59.   And we are mindful of a trial judge's sound discretion in determining a child's competency to testify.   *Frazier*.

{¶71} Moreover, we recognize that determinations of the credibility of any witness, as well as the weight of the evidence, are for the trier of fact. The factfinder has the benefit of viewing the witnesses and observing their demeanor, gestures, and voice

inflections and to use these observations to weigh credibility. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Accordingly, the trier of fact is free to believe all, some, or none of the testimony of each witness who testifies. *Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, at ¶ 18.

**{¶72}** Here, J.H.'s therapist testified that J.H. told her that her stepfather massaged her private parts underneath her clothing. The social worker testified that J.H. told her that her stepfather touched her private parts, he rubbed the part that sticks out of her private part, this occurred in her bedroom more than once, and she ultimately told her mother about the touching because her private parts began to hurt. Detective Reed testified that what J.H. told him was consistent with what J.H. had revealed to the therapist and the social worker.

**{¶73}** J.H. testified at trial that she was a big girl, she did not require help using the bathroom, and she did not have bathroom accidents. She also testified that she was "mixed up" when she spoke with her therapist and the social worker, and she meant to say that Fears only washed her, rather than massaged her; however, she testified that she changed her testimony only after her mother told her that she was mistaken, and she did not want to get Fears in trouble. J.H. also testified at trial that what she told the therapist, the social worker, and the detective was "the truth," and that she was afraid that if she said certain things about Fears, she would not be able to see him.

**{¶74}** In his defense, Fears explained that he was only cleaning J.H., as she often came home from school smelling of feces and urine. He testified, however, that the

school never reported this issue to him. Despite having soiled her underwear, Fears testified that he put J.H.'s dirty underwear back on her cleaned body, stating that he never thought to clean or replace the underwear first. Additionally, Fears, W.F., and M.G. testified that J.H. had difficulty wiping herself. However, there is no evidence in the record that this concern was ever reported to a doctor or a counselor. In fact, Coffman testified that this concern was never mentioned in any part of her assessment of J.H.

{¶75} In choosing between witnesses and their conflicting testimony, it is apparent that the jury in this case found the testimony of Fears, as supported by W.F. and M.G., to be incredible, which the jury was free to do. Additionally, it is likely that the jury was more persuaded by J.H.'s initial consistent statements to her therapist, the social worker, and the detective, rather than her "mixed up" testimony that resulted after speaking with her mother about the allegations.

{¶76} After reviewing the record and deferring to the trier of fact's credibility assessment, we are unable to conclude that the trier of fact lost its way and created a manifest injustice. Fears's conviction is therefore not against the manifest weight of the evidence.

{¶77} Fears's third and fourth assignments of error are overruled.

{¶78} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
TIM McCORMACK, JUDGE

KATHLEEN ANN KEOUGH, A.J., CONCURS WITH MAJORITY AND WITH SEPARATE CONCURRING OPINION;
MELODY J. STEWART, J., CONCURS (WITH SEPARATE CONCURRING OPINION)

MELODY J. STEWART, J., CONCURRING WITH SEPARATE CONCURRING OPINION:

**{¶79}** I concur with the decision reached by the majority. I write separately, however, to express my concern with regard to whether the state met its burden of proving the element of sexual arousal or gratification for sustaining the conviction for gross sexual imposition.

**{¶80}** To find Fears guilty of gross sexual imposition in violation of R.C. 2907.05(A)(4), the state was required to prove beyond a reasonable doubt that Fears's touching of J.H. constituted "sexual contact," which is defined in R.C. 2907.01(B) as

touching of an erogenous zone of another done for the purpose of "sexually arousing or gratifying" either J.H. or himself.

{¶81} J.H. stated that Fears washed her "private area" in the bedroom with a wash rag. After this Fears put lotion on her. J.H. testified that she laid down on the bed and Fears kneeled near it and that Fears did not say anything to her while putting lotion on her. When asked what his face looked like, J.H. said that Fears "looked just happy." The presentation of this evidence does not clearly indicate the sexual arousal or gratification aspect of the offense.

{¶82} I concede that absent direct evidence of this purpose, the trier of fact is permitted to infer it from circumstances of the contact. *State v. Finklea*, 8th Dist. Cuyahoga No. 100066, 2014-Ohio-1515, ¶ 17, citing *State v. Antoline*, 9th Dist. Lorain No. 02CA008100, 2003-Ohio-1130, ¶ 64; *State v. Edwards*, 8th Dist. Cuyahoga No. 81351, 2003-Ohio-998, ¶ 22 (sexual arousal or gratification may be inferred from the totality of the circumstances). But it is a close call to determine whether the purpose of sexual arousal or gratification can be inferred from the facts in this case. To view the evidence that Fears "massaged" J.H.'s vagina, for "[s]horter than a minute," when bathing her and that she stated that he "looked just happy," when asked about his facial demeanor as sufficient to base an inference, let alone conclusively establish, that the touching was done for sexual arousal or gratification may indeed ask too much.

{¶83} It is doubtful the jury concluded that Fears's actions were done to sexually arouse or gratify J.H. — these events occurred around the time she was seven to eight

years old. As with most cases where the offender is an adult and the victim is a child, the jury likely determined that Fears's touching of J.H. was for his own sexual gratification or arousal. There is no question that he touched a part of her body that is an "erogenous zone" as the statute requires. And although there is clear evidence of this touching and/or massaging J.H. — touching that he insists was done for the purpose of bathing and applying lotion to her — there is no evidence that the touching was for sexual gratification or arousal. *Compare State v. Sylvester*, 8th Dist. Cuyahoga No. 103841, 2016-Ohio-5710, ¶ 9 (defendant ground his penis against victim's buttocks and defendant admitted to police that he masturbated and ejaculated onto the victim's back); *State v. Kleyman*, 8th Dist. Cuyahoga No. 90817, 2008-Ohio-6656, ¶ 8-9 (defendant observed calling victim over to him, touched victim underneath her bathing suit, and a bulge was seen from defendant's bathing suit); *State v. Maybury*, 8th Dist. Cuyahoga No. 65831, 1994 Ohio App. LEXIS 3497, 9 (Aug. 11, 1994) (purpose of sexual arousal or gratification inferred from evidence of defendant's obsession with victim, pattern of enticement, insistence that police conclude investigation, and suggestion that victim could not live without him); *State v. Robinson*, 2015-Ohio-4533, 48 N.E.3d 109, ¶ 44 (12th Dist.) (defendant pulled victim's pants down, "tickled" her vagina, and told her to "keep it a secret"); *State v. Pistawka*, 9th Dist. Summit No. 27828, 2016-Ohio-1523, ¶ 16 (defendant kissed victim's face and neck while hugging her goodnight, which was "weird" to her, grabbed her from behind, pressed himself against her buttocks, and continued to kiss her for several minutes despite her protest); *State v. Sherrill*, 2d Dist.

Montgomery No. 17359, 2000 Ohio App. LEXIS 206, 2 (Jan. 28, 2000) (defendant touched victim's genitals for a couple of hours making him feel "funny").

{¶84} At the risk of being unduly descriptive, there is no evidence of Fears obtaining an erection, rubbing any sexual body part of his onto J.H. or pressing his body against hers, being naked with her, ejaculating anywhere, or anything of the like to indicate sexual arousal or gratification. There were a few instances of his touching J.H. taking place for brief moments during the time that Fears was J.H.'s caregiver.

{¶85} Fears insists that his touching of J.H. was strictly to bathe her and apply lotion. The record supports this contention. However, a reasonable trier of fact could find that Fears's actions were inappropriate: and inappropriate enough to rise to the level of having committed the offense of gross sexual imposition. Proof of an element of an offense can be inferred from the evidence, and the trier of fact was in a better position to make such an inference.

> [A] reviewing court "faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

*Cavazos v. Smith*, 565 U.S. 1, 7, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011), quoting *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). I therefore concur with the decision reached in this case.