[Cite as *State v. Flores*, 2024-Ohio-571.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 112389 |
| v. | : | |
| STEVEN FLORES, | : | |
| Defendant-Appellant. | : | |

---

**JOURNAL ENTRY AND OPINION**

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 15, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-671414-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nora Bryan, Assistant Prosecuting Attorney, *for appellee.*

Michael Gordillo, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Steven Flores ("Flores"), appeals his conviction for gross sexual imposition, a fourth-degree felony, raising the following four assignments of error for review:

**Assignment of Error I**:  The trial court committed reversible error prejudicing [Flores] by permitting hearsay testimony into evidence.

**Assignment of Error II:**  The trial court erred in convicting [Flores] of Count 5, and only Count 5, where the alleged conduct occurred outside Cuyahoga County.

**Assignment of Error III:**  [Flores's] conviction is not supported by sufficient evidence.

**Assignment of Error IV:**  [Flores's] was convicted against the manifest weight of the evidence.

{¶ 2}   For the reasons set forth below, we affirm.

## I.   Facts and Procedural History

{¶ 3} Flores was indicted on the following six counts, in June 2022:   Count 1— rape, Counts 2, 3, and 4 — gross sexual imposition for offenses occurring on or about April 12, 2018, to April 11, 2019, and Counts 5 and 6 — gross sexual imposition for offenses occurring on or about June 1, 2017, to September 1, 2017.   Flores is alleged to have committed these sex offenses against T.U.

{¶ 4} The matter proceeded to a jury trial in January 2023.  The state called five witnesses, the first being T.U.  T.U. testified that she lives with her parents, two older sisters, K.N. and C.U., and nephew, who is K.N. and Flores's child.  Prior to moving to Florida in December 2019, T.U. and her family lived in a house in Cleveland, Ohio.  T.U. stated that she first met Flores when she was around 11 years old, prior to the birth of her nephew.  (Tr. 250.) T.U. explained that when they first met, she and Flores were close and "[h]e was like a big brother."  (Tr.  250.)  T.U.

then went on to describe certain incidents with Flores that made her uncomfortable that are at the center of the charges against him.

{¶ 5} T.U. testified that the first incident occurred on an annual family camping trip in July 2017, when she was 12 years old. T.U. testified that she and more than 20 of her family members travelled to a campground in Akron, Ohio and set up tents near each other. T.U. said that she and Flores went on a walk alone one night and sat by a lake. T.U. stated that Flores laid his head on her lap while they were talking and put her on his shoulder when they began to walk back. T.U. commented that these behaviors were "normal to [her]." T.U. went on to explain that at one point, he moved her from the back of his shoulders to the front, causing her vaginal area to be in his face. T.U. noted that this made her uncomfortable, so she quickly got down and started walking back to the campsite with Flores.

{¶ 6} T.U. testified that after her walk with Flores, she slept in the same tent as Flores and her sister K.N. T.U. explained that K.N. was sleeping in the middle, between her and Flores. T.U. stated, "We went to sleep, and then in the middle of the night I felt sweaty, and I woke up, and [Flores] was rubbed up against me. He was sleeping in the middle now, and he was rubbing up against me." (Tr. 251.) T.U. claimed that "[Flores] was directly behind me with his private area against my back" and "[h]is penis was against my butt area." (Tr. 256-257.) T.U. felt Flores's penis area "[g]ently rubbing up against [her butt], kind of like a grind" for "like five minutes, not even." (Tr. 257.) T.U. testified, "It was clear he was awake to me, but he did not say anything." (Tr. 257.) T.U. described the incident as "[u]ncomfortable."

(Tr. 257.) T.U. noted that they were both clothed at the time and believed her sister was still asleep. T.U. said that Flores did not realize she woke up, so she acted like she was asleep, tried to move around to adjust her body away from him and "get him off [her]," waited about five minutes, and left to sleep in different tent with her sister, C.U. (Tr. 251.) T.U. explained that she left "[b]ecause [she] felt uncomfortable." (Tr. 258.) T.U. testified that she did not say anything to anyone in the other tent because they were sleeping. T.U. stated that while she felt "uncomfortable" seeing Flores the next morning, "[n]othing was said between me and him, and I didn't say nothing to nobody." (Tr. 258.)

{¶ 7} T.U. testified that a second incident occurred at her house in Cleveland between April and September of 2018, when she was 13 years old. T.U. explained that she shared a room with her sister C.U. and they were both sleeping in bed. T.U. mentioned that K.N. was pregnant, and she and Flores were sleeping on an air mattress in the same room. T.U. stated that once everyone was asleep, she felt Flores's arm over the bed "like rubbing up against me." (Tr. 260.) T.U. testified:

> He ended up grabbing my arm and made me touch his penis. It was erected and out. He made me stroke it a couple of times, but then I ended up moving my hand away, and I was still playing as if I was asleep, so I moved it away, and he then waited a couple of minutes before he started to — reached his hand back over on my thigh. I had shorts on this night, and he slowly rubbed and inserted his fingers [into my vagina] * * * an[d] started fingering me. And that didn't last long.

(Tr. 260.) T.U. explained that she felt "uncomfortable," moved near C.U., and switched places and cuddled with her until she knew Flores was sleeping again. (Tr. 265.) T.U. testified that no one else was awake when the incident

occurred, Flores acted "normal" the next morning, which made her feel "weird," but she acted normally too and did not tell anyone because it "felt unreal." (Tr. 267.)

{¶ 8} T.U. described a third incident that occurred between the first two in a different house in Cleveland, where K.N. and Flores were living at the time. T.U. explained that she, C.U., K.N., and Flores were all sharing a bed. T.U. testified, "[W]e all went to sleep normally. This is like an every summer occurrence, and woke up to the same thing, to him rubbing up against me." (Tr. 268.) T.U. described that "[Flores's] penis area [was] rubbing up against my butt area again." (Tr. 271.) T.U. testified that they were both clothed but she knew it was different than somebody moving around at night trying to get comfortable "[b]ecause it was very obvious, dry humping. * * * He was holding me like forcefully putting himself against my body, and it was ongoing. It wasn't him moving around." (Tr. 271.) T.U. said she was "scared," did not know how to react, and did not move or sleep elsewhere. (Tr. 272.) T.U. testified that she should have told someone right then and there, but did not say anything.

{¶ 9} T.U. stated that she first disclosed these incidents to her best friend, K.R., sometime after she moved to Florida in December 2019. T.U. testified that the information was kept between the two of them until October or September 2021, when she disclosed that she had been sexually assaulted to a school counselor in Florida, identified Flores, and told her that "he touched me." (Tr. 279.) T.U. explained that "[the school counselor] asked for details, and I continued giving her briefly, telling her what happened." (Tr. 279.) T.U. explained that she did not think

anything was going happen as a result of her disclosure, but later that day police officers came to her home and told her mother what happened. T.U. testified that after she told her mother everything, her mother took her to an interview with a Florida social worker. T.U. said that she told the social worker what happened during a recorded interview. T.U. explained that she did not disclose any information about the incidents with Flores while she lived in Cleveland because she was "uncomfortable" and "embarrassed." (Tr. 283.)

{¶ 10} On cross-examination, T.U. agreed that her family greatly outnumbered Flores at the campsite and she chose to sleep in the tent with Flores and K.N. despite having more than ten other tents to choose from. T.U. explained that she did not say anything to police officers about the incident because they knew all of the information from the school counselor. T.U. further acknowledged that she did not tell the school counselor about what happened at the campsite and explained that she did not "go into full detail" with the school counselor: "It was very brief, me telling her that I was touched." (Tr. 286.) T.U. confirmed that despite being in a small tent and Flores moving on top of K.N., squeezing next to T.U., and proceeding to "dry hump[ ]" her, K.N. never woke up; nor did K.N. and C.U. wake up or notice either incident in Cleveland. T.U. could not recall if she saw a medical doctor in Florida about anything related to the incidents and did not start any kind of counseling.

{¶ 11} T.U. further acknowledged that she had plenty of chances to tell her family and did not say anything for roughly three years. T.U. confirmed that she was

embarrassed and testified that she "didn't feel like getting involved in anything, any drama, and * * * just dealt with it [her]self" because Flores was her nephew's father. (Tr. 300.) She later explained, "I knew if I did speak up, it would come to something like this. If I brought it a while ago, and I thought I would want my nephew to have a father in his life because I know my sister was big on family because she never had a father." (Tr. 303.)

{¶ 12} Next, the state called K.R., who testified that she and T.U. had been best friends since the second grade. K.R. described their friendship as balancing each other out and telling each other everything. K.R. stated that they talk almost every day through text messages, phone calls, and Facetime. K.R. corroborated T.U.'s testimony that they discussed Flores and T.U.'s "trauma" from sexual assault around 2020, after T.U. moved to Florida. K.R. testified that she could tell T.U. was "uncomfortable" during their conversation. (Tr. 311.) K.R. stated that she did nothing with the information and kept it to herself "[b]ecause I knew [T.U.] trusted me with [it]." (Tr. 312.) K.R. further corroborated T.U.'s testimony that she spoke to a social worker in Florida.

{¶ 13} Testimony was then offered by T.U.'s mother, who identified Flores in open-court. T.U.'s mother testified that Flores participated in family events, they were all close with him, and she cared about him. T.U.'s mother confirmed that Flores went on a family camping trip in July 2017, when T.U. was 12 or 13 years old. T.U.'s mother testified that the campground was in North Lawrence, Ohio. T.U.'s mother testified that everything seemed normal on the camping trip

and the family still had a good relationship with Flores afterwards. T.U.'s mother further testified that T.U.'s demeanor did not change, nor did T.U. mention that she was uncomfortable. T.U.'s mother advised that Flores and K.N. would occasionally live together and Flores visited K.N. and the family at their home while K.N. was pregnant. T.U.'s mother confirmed that Flores would spend the night and it was typical for the family to sleep in one room. T.U.'s mother further confirmed that police came to their house in Florida in September of 2021 and that's when she learned that "T.U. was being molested by Steven Flores." (Tr. 332.) T.U.'s mother testified that T.U. disclosed that Flores was the perpetrator and indicated what happened to her during her time in Cleveland. T.U.'s mother confirmed that she took T.U. for a follow-up interview with a social worker and explained that she was in the waiting room when the interview took place. On cross-examination, T.U.'s mother acknowledged that T.U. did not say anything to her previously and she did not try to avoid him.

{¶ 14} Following this testimony and prior to proceedings being adjourned for the day, the state requested a continuing course of conduct jury instruction for the offense related to Count 5, which occurred at a campground outside of Cuyahoga County, Ohio. The issue was briefed by the state prior to discussion the next morning. During that discussion, defense counsel objected to this jury instruction, arguing that "the Ohio Constitution clearly indicates that venue lies only in the county where the crime is committed, or an element of the crime is committed. It does not leave open any interpretation beyond the plain language of the

Constitutional article." Defense counsel further argued against a three factor test for application of a statute that will extend venue beyond county lines. (Tr. 344.) In response, the state referenced *State v. Davis*, 8th Dist. Cuyahoga No. 107925, 2019-Ohio-4672, and R.C. 2901.12(H)(1) and argued that because Counts 1 through 4 involved criminal conduct occurring in Cuyahoga County between the same persons, Flores and T.U., and that although the alleged criminal conduct involved in Count 5 occurred outside of the Cuyahoga County it was part of the same course of conduct. The trial court advised that it reviewed R.C. 2901.12(A), read the caselaw presented by the state, noted defense counsel's objection, and ruled that the continuing course of conduct instruction would be presented to the jury.

{¶ 15} The trial court then addressed another issue: whether the state could play a video recording of the interview that the Florida social worker had with T.U. The trial court noted that the state provided Eighth District caselaw in support of its argument and the trial court completed its own independent research. Defense counsel objected, arguing the caselaw submitted by the state was "very distinguishable from the case we have before us." (Tr. 347.) Defense counsel further argued that the interview did not fall within hearsay exception for statements made for the purpose of medical diagnoses and treatment because "[e]ssentially, it's a police interview * * * made at the detective's request. There's nothing medical, whatsoever, about it. It's testimonial and does not fit by any interpretation into a statement made for diagnosis or treatment." (Tr. 349.) In response, the state argued that the exception was applicable, arguing regardless of the source of the

referral, the social worker's primary purpose in conducting the interview was "looking for safety, medical diagnosis, need for ongoing counseling, whether the perpetrator has access to her or not." (Tr. 350-351.) The trial court said that it reviewed *State v. Jeffries*, taking special note of the concurring separate opinion explaining that he was constrained to follow this court's precedent regarding the scope of testimony that may be elicited under the parameters of Evid.R. 803. Noting defense counsel's objection, the trial court determined that the video recording interview of T.U. would be played for the jury.

{¶ 16} The state then called Kenyel Day ("Day"), the program director for the Child Protection Team ("CPT") in Florida. Day explained that CPT receives cases from either the department of child and family ("DCF") or law enforcement and provides interviews and medical services for victims of abuse and neglect. Day testified that when she received the assignment to follow up on a report pertaining to T.U. in October 2021, she was CPT's program supervisor and part of her role was to conduct interviews with children. Throughout her career, Day estimated that she conducted over 1,000 interviews relating to sexual abuse of children.

{¶ 17} Day explained that CPT conducted two types of interviews: forensic and specialized. Day described forensic interviews as "more of a fact-finding interview, which allows the child to — to elicit information in regards to abuse and neglect" and specialized interviews as "focus[ing] more on the overall picture and family dynamics." (Tr. 358.) Day testified that specialized interviewing is learned on the job while forensic interviewing requires a 40-hour training. Day advised that

she completed forensic interview training and the primary purpose of her role in interviewing children is "to assess the allegations and their safety, and then we provide our recommendations to DCF or law enforcement * * * on what we feel is best to either reduce the risk or to ensure the child is safe at the time." (Tr. 359.) Day explained that during interviews, the child's needs for ongoing medical treatment and counseling are also assessed, although the child and the parent have a right to decline those services. Day confirmed that these primary purposes remain the same, regardless of whether the referral came from law enforcement or DCF. Day advised that interviews are recorded, "[t]hat way if law enforcement or DCF should ask to get the information or to know what was all said in the interview, it gives them an opportunity to see it in real-time * * *." (Tr. 361.)

{¶ 18} Day testified that she conducted a forensic interview and met with T.U. in November 2021 after the matter was referred by a detective in Ohio. Day explained that after receiving the referral, she contacted the detective to find out what services were being requested and what was needed. Day testified that the detective requested that T.U. be interviewed at CPT's office regarding some allegations of sexual abuse. Day authenticated the video recording of T.U.'s forensic interview, which was played for the jury after the trial court noted defense counsel's objection. Day described the scene that was depicted, explained various aspects of the interview, including "[T.U.] talking about a couple of incidents being touched inappropriately[.]" (Tr. 369.) The video recording depicts T.U. describing the incidents that occurred at the campground in Akron and in two homes in Cleveland,

similar to T.U.'s testimony. Day testified that during the interview, she assessed whether Flores still had access to T.U. and noted that it was important to determine whether T.U. was safe. Day believed that a victim's advocate was assigned to T.U. after the interview and a discussion was had about T.U. being referred to a sexual assault treatment program.

{¶ 19} On cross-examination, Day acknowledged that she received a report from the Florida police department prior to her interview with T.U. and noticed that there was no mention of any incident at a campground. Day testified that she made an offer for a medical evaluation to T.U. and her mother; however, she did not believe they accepted it. Day explained further explained her role after an interview is completed:

> So there's only one referral that we would make at CPT, the Child Protection Team. That would be to the SAT Program. That's Sexual Assault Treatment Program. Any other recommendations that we make, they would be for either DC[F] or the victim's advocate that was working with the family to make the referral to whatever that is, so whatever that service is. Once we complete our interview, our connection and interaction with the family is complete after that.

(Tr. 377-378.) Day did not know whether T.U. took advantage of her referral to the SAT Program.

{¶ 20} The state then called its last witness, Detective Darryl Turner ("Detective Turner") from the Cleveland Police Department's Sex Crimes and Child Abuse Unit. Detective Turner testified that he received an assignment to follow up on a report pertaining to T.U. in October 2021. Detective Turner explained that T.U.'s mother called his sergeant after making a report to the Florida police

department and receiving notification to contact the Cleveland Police Department because the crime occurred there. Detective Turner testified that he made an initial report, reached out to a child advocacy center in Florida, was linked to CPT, and spoke to Day. Detective Turner stated that he asked Day to conduct a "courtesy interview." (Tr. 388.) Detective Turner testified that he reached out to T.U.'s mother after T.U.'s forensic interview, received and reviewed a copy of it, learned that Flores was the named perpetrator, and presented the facts of the case to a city prosecutor.

{¶ 21} On cross-examination, Detective Turner acknowledged that there was no reference to any incident at a campground in the Florida police report, which described only one incident. Detective Turner conceded that he did not request T.U.'s school or T.U. or Flores's cell phone records; ask Day to refer T.U. for medical evaluation; interview any witnesses, including T.U.; or follow-up with Day after watching the recorded interview. Detective Turner further conceded that the name of the campground was never disclosed prior to the testimony heard in the courtroom that day.

{¶ 22} Following Detective Turner's testimony, the state rested and moved to dismiss Count 6. Flores also moved for dismissal pursuant to Crim.R. 29, arguing that no testimony was offered about the conduct alleged in Counts 4 and 5 being committed with the purpose of arousal or sexual gratification and venue was improper. The state argued that the jury should be allowed to ascertain from the surrounding circumstances whether the acts were committed with the purpose of

Flores's sexual gratification. The trial court dismissed Count 6 and denied Flores's Crim.R. 29 motion. The defense did not present any witnesses, rested, and renewed its Crim.R. 29 motion, standing by its prior argument. The trial court advised that its ruling remained the same. The state then offered that the redacted video recording of T.U.'s forensic interview as an exhibit and be admitted into evidence. The trial court noted defense counsel's objection and admitted this exhibit into evidence. The trial court further noted that jury instructions were reviewed off-the-record, and the parties agreed to the final version, which included instructions on venue and course of conduct. The trial court then charged the jury, providing the following instructions regarding venue and course of conduct:

> Venue. Before you can decide whether the State of Ohio has proved beyond a reasonable doubt all the essential elements of the offenses with which the Defendant was charged, you must first decide whether this is the correct county in which the trial should be held. The State must prove beyond a reasonable doubt that all or any part of the offenses involved in the Defendant's course of conduct occurred in Cuyahoga County, Ohio.

> Course of conduct. In order for you to find that a course of conduct existed, you must find beyond a reasonable doubt that, one, the offenses involve the same victim, or, two, the offenses were committed by the Defendant in his same capacity or relationship to another or, three, the offenses were committed as part of the same chain of events or in furtherance of the same purpose or objective or, four, the offense involved the same or similar modus operandi, scheme, plan, system or method. If you find the State proved beyond a reasonable doubt that this is the correct county in which this trial should be held, then you must proceed to decide whether the Defendant is guilty of the offense charged. If you find the State failed to prove beyond a reasonable doubt that this is the correct county in which this trial should be held, you must notify the Court of this finding and should not proceed to decide whether the Defendant is guilty of the offense as charged.

(Tr. 425-426.) The parties presented their closing arguments, and the jury began deliberations.

{¶ 23} The jury returned verdicts of not guilty for Counts 1 through 4 and guilty for Count 5. The trial court ordered a presentence-investigation report and scheduled Flores's sentencing hearing for a later date. At the sentencing hearing, the trial court imposed a six-month prison sentence and determined that Flores was a Tier I sex offender, requiring registration.

{¶ 24} Flores now appeals his conviction for gross sexual imposition, Count 5.

## II. Law and Analysis

### A. Hearsay

{¶ 25} In his first assignment of error, Flores argues that the trial court committed reversible error when it admitted hearsay testimony into evidence. Flores contends that the video recording of T.U.'s interview with Day that was played for the jury is hearsay evidence and the trial court abused its discretion by not excluding it. Flores claims that no exceptions to the hearsay rule exist because the purpose of the Day's interview with T.U. was investigative and the recording contained prejudicial statements.

{¶ 26} "The trial court has broad discretion in the admission or exclusion of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should be slow to interfere." *State v. Davenport*, 8th Dist. Cuyahoga No. 99328, 2013-Ohio-3731, ¶ 6, citing *State v.*

*Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 122. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). Pursuant to Evid.R. 802, hearsay is inadmissible unless an exception or exclusion applies. Evid.R. 803 enumerates 23 exceptions to this rule, including "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The staff notes to the rule provide in pertinent part:

> The circumstantial guaranty of trustworthiness of this exception is derived from the assumption that a person will be truthful about his physical condition to a physician because of the risk of harmful treatment resulting from untruthful statements. * * * The exception is limited to those statements made by the patient which are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted.

Staff Notes to Evid.R. 803(4).

{¶ 27} This court has explained the application of this exception in instances where testimony is offered by a child advocacy social worker offers testimony in sexual assault cases:

> In sexual assault cases involving young victims, there is often testimony from a child advocacy social worker. And courts have acknowledged the "dual role" — medical diagnosis/treatment and investigation/gathering of evidence — of social workers who interview a child who may be the victim of sexual abuse. *See State v. Arnold*, 126 Ohio St. 3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 33. Only those statements made for the purpose of diagnosis and treatment are

admissible under Evid.R. 803(4). *State v. Muttart*, 116 Ohio St. 3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 46 (regardless of whether a child less than ten years old has been determined to be competent to testify, the child's statements may be admitted at trial as an exception to the hearsay rule if they were made for purposes of medical diagnosis or treatment); *State v. Goza*, 8th Dist. Cuyahoga No. 89032, 2007-Ohio-6837, ¶ 39. Social workers are oftentimes in the best position to help determine the proper treatment for the minor, which treatment includes determining which home was free of sexual abuse. *State v. Durham*, 8th Dist. Cuyahoga No. 84132, 2005-Ohio-202, ¶ 33, citing *Presley v. Presley*, 71 Ohio App.3d 34, 39, 593 N.E.2d 17 (8th Dist.1990).

To the extent a victim's statement to a social worker is for investigative or prosecutorial purposes, the statement will not fall within the hearsay exception under Evid.R. 803(4). *See State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 42. The fact that the information initially gathered by the social workers was subsequently used by the state in its prosecution, however, does not change the fact that these statements were not made for investigative or prosecutorial purposes. *Muttart* at ¶ 62. Trial courts are entrusted with recognizing the point at which nontestimonial (admissible under Evid.R. 803(4)) statements become testimonial (falling outside the hearsay exception). *See Davis v. Washington*, 547 U.S. 813, 828, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

*State v. Fears*, 8th Dist. Cuyahoga No. 104868, 2017-Ohio-6978, ¶ 37-38.

{¶ 28} Flores does not dispute that case law from our court generally allows testimony from child advocacy workers relating to forensic interviews they conduct with allegedly sexually abused children when that testimony is for the purpose of medical diagnosis and treatment in accordance with Evid.R. 803(4). However, in this appeal, he argues that the testimony from Day and the video recording of Day's interview with T.U. was inadmissible hearsay since it was for investigative or prosecutorial purposes and as such "will not fall within the hearsay exception under Evid.R. 803(4). *See Rose* at ¶ 42.

{¶ 29} Flores points out that Day was contacted by the police for the purpose of interviewing the sexual abuse allegations made by T.U. that was to be used against the perpetrator for criminal prosecution. He compares Day's interview to a police interview. Flores does not specifically reference in his argument what testimony Day gave or what in the video recording that the jury heard was hearsay and prejudicial. The state maintains that when looking at Day's testimony offered at trial, it clearly shows that Day's testimony is nontestimonial, that she provides her professional background as a director of a child advocacy group who interviews children suspected of having been sexually abused. Even though the state acknowledges that Day received the request from Detective Turner to interview T.U., the interview was not a police interview. Rather, it was for the purpose of her assessing the safety of T.U. and determining if the alleged perpetrator was present in T.U.'s life and posed a continuing threat of harm to her, for medical diagnosis and treatment. Our review of the record, and testimony supports the state's position that it follows Evid.R. 803(4) because it was for medical diagnosis, treatment, and evaluating the safety/harm to T.U. We cannot say that the trial court abused its discretion by allowing Day's testimony and the forensic interview recording to be played for the jury.

{¶ 30} The first assignment of error is overruled.

### B. Venue

{¶ 31} In his second assignment of error, Flores argues that the trial court erred in convicting him of Count 5 — gross sexual imposition, and only Count 5,

where the alleged criminal offense did not occur in Cuyahoga County, the location of where Flores was tried by jury. Flores contends that "the alleged course of conduct never materialized" and as such the charge was improperly heard in Cuyahoga County, Ohio. Flores states that "[R.C. 2901.12(H)] could be read to allow conviction for the improperly venued count or counts to occur only upon conviction of at least one offense that was properly venued" and thus asks us to overturn his conviction.

{¶ 32} Venue is established under Article I, Section 10 of the Ohio Constitution, which provides the accused with the right to "a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed." R.C. 2901.12(A) further requires that "a criminal case in this state shall be held * * * in the territory of which the offense or any element of the offense was committed." This court explained:

> Venue is a fact that must be proved beyond a reasonable doubt in criminal prosecutions unless it is waived by the defendant. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 149. When the evidence is insufficient for reasonable minds to find that venue is proper, a motion for judgment of acquittal must be granted. [*State v. Hampton*, 134 Ohio St.3d 447, 2012-Ohio-5688, 983 N.E.2d 324, ¶ 24]. "Venue is satisfied where there is a sufficient nexus between the defendant and the county of the trial." *State v. Chintalapalli*, 88 Ohio St.3d 43, 45, 2000-Ohio-266, 723 N.E.2d 111 (2000).

*State v. Davis*, 8th Dist. Cuyahoga No. 107925, 2019-Ohio-4672, ¶ 27.

{¶ 33} However, R.C. 2901.12(H) allows offenses that are part of a course of criminal conduct to be tried in other jurisdictions under certain circumstances:

When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:

(1) The offenses involved the same victim, or victims of the same type or from the same group.

(2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.

(3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.

(4) The offenses were committed in furtherance of the same conspiracy.

(5) The offenses involved the same or a similar modus operandi.

(6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

{¶ 34} The state concedes that T.U. testified that the offense relating to Count 5, the only count which he was found guilty, occurred at a campground located outside Cuyahoga County, Ohio in a contiguous county. However, the state maintains that "R.C. 2901.12(H) allows offenses that are part of a course of criminal conduct to be tried in other jurisdictions under certain circumstances" that apply here. In the instant case, all six counts in the indictment pertained to the same victim, T.U., and all six counts were allegedly committed by Flores, in his "brotherly" relationship with T.U. Additionally, for Counts 1-4 T.U. testified that these offenses occurred in Cuyahoga County and were similar in nature, sexual offenses, and in furtherance of the same purpose or objective, same chain of events,  and the offenses

were involving the same or similar modus operandi for sexual gratification. *See, e.g., Davis*, 8th Dist. Cuyahoga No. 107925, 2019-Ohio-4672 (finding venue was proper in Cuyahoga County because appellant committed the offenses charged in the indictment as part of a criminal course of conduct despite Counts 1 and 2 occurring in Summit County). Significantly, R.C. 2901.12(H) does not require the course of criminal conduct to originate in the jurisdiction where the trial is held. *See, e.g., State v. Workman*, 12th Dist. Clermont Nos. CA2016-12-082, CA2016-12-083, 2017-Ohio-8638 (holding venue was appropriate in Clermont County for all offenses where first offenses were committed Hamilton County).

{¶ 35} Therefore, the second assignment of error is overruled.

### C. Sufficiency of the Evidence

{¶ 36} In his third assignment of error, Flores argues that the state failed to present sufficient evidence to sustain his conviction for gross sexual imposition. Specifically, Flores claims that no evidence was presented that he intended to sexually arouse or gratify himself or T.U. when he engaged in the alleged conduct. Flores asserts that the jury had to infer that he was awake, consciously rubbing his hips against T.U.'s buttocks, and intending to arouse or gratify despite both parties remaining clothed and the absence of testimony "concerning overt physical signs of arousal or verbal or non-verbal communication."

{¶ 37} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when

reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 38} With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 39} In *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

{¶ 40} Here, Flores was convicted of gross sexual imposition under R.C. 2907.05 which provides in relevant part:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>> (1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.
>> * * *
>> (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.
>
> (B) No person shall knowingly touch the genitalia of another, when the touching is not through clothing, the other person is less than twelve years of age, whether or not the offender knows the age of that person, and the touching is done with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.
>
> (C) Whoever violates this section is guilty of gross sexual imposition. R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

{¶ 41} In determining whether sexual contact occurred, "the proper method is to permit the trier of fact to infer from the evidence presented at trial whether the purpose of the defendant was sexual arousal or gratification by his contact with those areas of the body described in R.C. 2907.01." *Id.* The purpose of the contact may be inferred from the type, nature, and circumstances of the contact. *Id.* at ¶ 20. While the phrase "sexually arousing or gratifying" is not defined by the Revised Code, this court has held that "R.C. 2907.01(B) '"contemplate[s] any touching of the described areas which a reasonable person would perceive as sexually stimulating or gratifying."'" *State v. Bryant*, 2022-Ohio-3669, 199 N.E.3d 919, ¶ 44 (8th Dist.)

quoting *State v. Tate*, 8th Dist. Cuyahoga No. 98221, 2013-Ohio-370, ¶ 18, quoting

*State v. Astley*, 36 Ohio App.3d 247, 250, 523 N.E.2d 322 (10th Dist.1987). This

court has further explained:

> In determining whether sexual contact occurred, the trier of fact may infer from the evidence presented at trial whether the defendant's contact with the areas of the body outlined in R.C. 2907.01 was for the purpose of sexual arousal or gratification. *Tate*; *State v. Cobb*, 81 Ohio App.3d 179, 185, 610 N.E.2d 1009 (9th Dist.1991). The purpose of the contact may be inferred from the type, nature, and circumstances of the contact. *Tate* at ¶ 20, citing [*State v. Meredith*, 12th Dist. Warren No. CA2004-06-062, 2005-Ohio-2664]; see also *Ohio v. Coleman*, 8th Dist. Cuyahoga No. 102291, 2015-Ohio-4491, ¶ 7 (finding that purpose may also be inferred from the defendant's conduct as well as his or her personality). Accordingly, "[i]f the trier of fact determines that the defendant was motivated by desires of sexual arousal or gratification, and that the contact occurred, then the trier of fact may conclude that the object of the defendant's motivation was achieved." *Cobb* at 185.

*Id.*, quoting *Fears*, 8th Dist. Cuyahoga No. 104868, 2017-Ohio-6978, at ¶ 65.

{¶ 42} In this case, the state presented evidence through the testimony of

T.U. to satisfy its burden of production as to the elements of gross sexual imposition.

T.U. testified in July 2017 when she was 12 years old and at the family's annual

camping trip, she slept in the same tent as Flores and her sister K.N. T.U. explained

that K.N. was sleeping in the middle, between her and Flores. T.U. testified that "We

went to sleep, and then in the middle of the night I felt sweaty, and I woke up, and

[Flores] was rubbed up against me. He was sleeping in the middle now, and he was

rubbing up against me." (Tr. 251.) T.U. claimed that "[Flores] was directly behind

me with his private area against my back" and "[h]is penis was against my butt

area." (Tr. 256-257.) T.U. felt Flores's penis area "[g]ently rubbing up against [her

butt], kind of like a grind" for "like five minutes, not even." (Tr. 257.) T.U. testified, "It was clear he was awake to me, but he did not say anything." (Tr. 257.) T.U. described the incident as "[u]ncomfortable." (Tr. 257.) T.U. noted that they were both clothed at the time and believed her sister was still asleep. T.U. explained that Flores did not realize she woke up, so she acted like she was asleep, tried to move around to adjust her body away from him and "get him off [her]," waited about five minutes, and left to sleep in different tent with C.U. (Tr. 251.) T.U. explained that she left "[b]ecause [she] felt uncomfortable." (Tr. 258.) T.U. testified that she did not say anything to anyone in the other tent because they were sleeping. T.U. stated that while she felt "uncomfortable" seeing Flores the next morning, "[n]othing was said between me and him, and I didn't say nothing to nobody." (Tr. 258.) This evidence, when viewed in a light most favorable to the state, can be inferred to establish that Flores committed the offense with the purpose of sexual arousal or gratification needed to support his conviction for gross sexual imposition. Accordingly, the third assignment of error is overruled.

### D. Manifest Weight of the Evidence

{¶ 43} In the fourth assignment of error, Flores argues that his conviction for gross sexual imposition is against the manifest weight of the evidence.

{¶ 44} When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the

conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin* at 175.

{¶ 45} As this court has previously stated:

> The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 46} Flores argues that his conviction is against the manifest weight of the evidence because: (1) it was not supported by sufficient evidence and (2) the evidence failed to show he committed any offense in Cuyahoga County. Flores asserts that a conviction "predicated upon insufficient evidence is necessarily against the manifest weight of the evidence." Flores further claims that the jury "was

set up for confusion by the venue and course of conduct issues" and clearly lost its way in rendering a guilty verdict as to Count 5 only, which occurred at a park in Summit County.

{¶ 47} Flores raises the same arguments in the fourth assignment of error as he raised in his first three assignments of error. Since he adds nothing new other than calling these errors as against the manifest weight of the evidence, we rely upon our discussion above. After reviewing the entire record, weighing the inferences, and examining the credibility of witnesses, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. Flores's conviction is not against the manifest weight of the evidence.

{¶ 48} The fourth assignment of error is overruled.

{¶ 49} Accordingly, the judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
SEAN C. GALLAGHER, J., CONCUR