[Cite as *State v. Griffin*, 2025-Ohio-1459.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

    v.                            :

JOHNNY GRIFFIN, JR.,                    :

    Defendant-Appellant.          :

No. 114338

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 24, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-678423-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Gregory M. Paul, Assistant Prosecuting Attorney, *for appellee.*

John F. Corrigan, *for appellant.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} Johnny Griffin, Jr. ("Griffin"), appeals his convictions for two counts of gross sexual imposition ("GSI"), in violation of R.C. 2907.05(A)(4), with sexually violent predator specifications. For the following reasons, we affirm the trial court's judgment.

## I.  Facts and Procedural History

{¶ 2} On February 7, 2023, Griffin was indicted for four counts of GSI, in violation of R.C. 2907.05(A)(1) and (4), and two counts of kidnapping, in violation of R.C. 2905.01(A)(4), along with sexually violent predator specifications.  These charges stemmed from allegations that Griffin inappropriately touched his granddaughter, K.D., who was nine years old at the time, and  his granddaughter, C.J., who was 13 years old at the time.  The State alleged that these offenses took place between February 20, 2022 and February 23, 2022.

{¶ 3} This case proceeded to a jury trial and on May 16, 2024, Griffin was found guilty of the two counts of GSI that related to K.D.  The jury acquitted Griffin of all other counts.  The sexually violent predator specifications were tried to the bench, and the court found that "the State has proved the defendant is a sexually violent predator as to the specifications on counts one and two in this case, and he is thus designated."

{¶ 4} On August 12, 2024, the court sentenced Griffin to life in prison with parole eligibility after two years on each count of GSI and ordered the sentences to run consecutively.  "I am imposing two life sentences consecutive to each other. You will be eligible for parole after 4 years."

{¶ 5} Griffin appeals raising three assignments of error for our review.

> I.  The trial court erred in admitting out of court forensic interviews conducted by a sex abuse child protection specialist taken at a child advocacy center when the statements primarily served a forensic or investigative purpose rather than statements made for purposes of medical diagnosis or treatments in violation of OH Evid. R. 803(4).

II.  The trial court erred in allowing the forensic expert to testify that the disclosures of CJ and K[D] were credible.

III.  The cumulative effect of the errors at appellant's trial deprived him of his constitutional right to a fair trial.

## II.  Trial Testimony

{¶ 6} Griffin's assignments of error relate to the testimony of Cuyahoga County Department of Children and Family Services' ("CCDCFS") employee Stephanie Moore ("Moore") and the video of the forensic interview she conducted of K.D., which was played for the jury during Griffin's trial.[1]  Moore's testimony and the video of her interviewing K.D. will be detailed below.  The following is a summary of the testimony of the other witnesses at Griffin's trial and is not at issue in this appeal.

{¶ 7} At Griffin's trial, C.J., K.D., their mother ("Mother"), their grandmother ("Grandmother") and a Cleveland Police Department Sex Crime and Child Abuse Unit detective testified.  These witnesses established that, in February 2022, C.J., K.D. and Mother were living with Grandmother.  Griffin, who is C.J. and K.D.'s maternal grandfather, was visiting Grandmother while C.J. and K.D. were staying with her.  Prior to this C.J. and K.D. did not have a relationship with Griffin.

---

[1] Moore also conducted a forensic interview of C.J., which was recorded, and the video was played for the jury at Griffin's trial.  Our review focuses on K.D.'s interview because Griffin was convicted of gross sexual imposition related to K.D. and acquitted of all offenses related to C.J.

**{¶ 8}** C.J. testified that Griffin "rubbed against [her] vagina and squeezed [her] leg . . . ." C.J. additionally testified that Griffin "pretended that he dropped something on the floor, and as he was going to pick it up he slapped my butt . . . ."

**{¶ 9}** K.D. testified that when she and Griffin were doing word searches in the dining room, Griffin "started to touch [her] butt." K.D. stated, "I was standing up finding a word search, and then that's when he had like put his hand down my butt." According to K.D., this occurred "on top of" her clothes and Griffin moved his hand "a little." K.D. testified that, at the time, she thought Griffin's touch may have been an accident. K.D. further testified that, later that night, she and Griffin were doing another word search when Griffin touched her "butt" again. According to K.D., "it was on the cheek of my butt and then that's when he had like went to my thigh. He had like went down a little bit and then he moved on to my thigh." Asked where on her thigh Griffin touched her, K.D. said, "Like at the top where my private part is." K.D. clarified that Griffin touched her near her vagina.

**{¶ 10}** C.J. and K.D. reported this inappropriate touching to Mother and Grandmother. Grandmother ordered Griffin to leave the house and neither C.J. nor K.D. saw or talked to him again until trial. On March 14, 2022, Mother reported these incidents to the police. CCDCFS became involved, and Moore was assigned to the case.

### a. Stephanie Moore's Testimony

### i. Voir Dire

{¶ 11} Prior to Moore testifying, the court heard arguments from the parties regarding whether video recordings of Moore's interviews of C.J. and K.D. conducted at the Child Advocacy Center ("CAC") were admissible under Evid.R. 803(4). The court allowed the parties to voir dire Moore outside of the jury's presence to "elicit questions pursuant to *Arnold* [regarding] whether this was a forensic interview or for the purposes of medical treatment."

{¶ 12} Moore testified that she works for CCDCFS as a permanency and support specialist and her prior position with the agency was as a child protection specialist in the sex abuse intake department. Moore held this position for nine years. As part of her job duties, Moore would "interview children who were involved in child sex abuse." Moore worked on "about 130 [to] 150" cases per year. The first thing Moore was required to do when she received a case was to "review the case and assess for safety, assess for the immediate safety of the children." Moore testified that, after she "makes contact" with the family, she conducts "follow-up" interviews, which are also called "forensic" interviews. Asked what a forensic interview is, Moore testified as follows: "A forensic interview is a non-leading interview in regards to any type of abuse and/or neglect, and that's done in a neutral setting in order to, you know, eliminate a lot of trauma to the children involved."

{¶ 13} Moore testified that she has received training on how to conduct a forensic interview and, over the years, she has conducted "thousands" of these

interviews. According to Moore, "different parties" could observe these interviews, including "an advocate, medical, . . . somebody involved with mental health of a child, and/or law enforcement." Moore clarified that these "different parties" are not in the interview room but are observing via "audiovisual hookup" from another room. Moore testified that the "primary purpose" of these interviews is "to determine — assess safety and do referrals for medical or psychological services." Asked if this primary purpose changes when law enforcement is observing, Moore answered, "No."

{¶ 14} Moore testified about the CCDCFS intake form for this case, which is dated March 15, 2022. Moore testified that the "Intake Narrative" portion of this form states, in part, as follows: "Cleveland Sex Crimes unit is investigating the case and is requesting the agency's assistance in conducting forensic interviews with the children." Moore testified that "a lot of times law enforcement may be involved. We're two different entities, so their involvement doesn't change if we become involved or not become involved." According to Moore, in this case, the police were already investigating the allegations prior to CCDCFS becoming involved.

{¶ 15} Moore testified that she made "first contact" with the family in this case on March 16, 2022, "for immediate safety concerns." Mother reported to Moore that Griffin was no longer at the house and did not have access to the children. Moore agreed with defense counsel that the "nature of the allegations" in this case was "[t]ouching on the outside of the clothes" and that there was a delay of "about a month" between the incident and the reporting to police. According to Moore, these

details led her to conclude that there were no immediate safety concerns in this case and "[t]here wasn't an immediate need for medical treatment" of C.J. and K.D.

{¶ 16} Moore next testified about the forensic interviews that took place on March 23, 2022. Moore testified that she interviewed both C.J. and K.D., "individually and private," at the CAC. Moore testified that, according to her "activity log," this was a "medical professional referral." According to Moore, former Cleveland Police Detective Alex Johnson ("Johnson") observed the interviews.[2] Moore testified that she did not recall speaking with the detective prior to conducting the interviews. According to Moore, the "primary purpose" of these interviews was to "assess for ongoing safety and to determine any medical or psychological referrals that would need to be completed."

{¶ 17} Moore testified that, typically, she "steps out" of the interview near the end for "various reasons": "At that time it could be that the child needs a break, or if I need to recollect and think if there's any further questions. Or sometimes I need to talk to the parent or talk to other parties involved. I'll talk to any providers, you know, law enforcement, anybody that's there." According to Moore, she "stepped out" of both interviews in this case, but she did not recall if she "spoke with anybody during those breaks."

{¶ 18} Defense counsel asked Moore, "So you think you had a brief conversation with the detective before the interviews, right?" Moore answered,

---

[2] Johnson did not testify at Griffin's trial. Rather, Cleveland Police Detective Angela Lampkin testified.

"Yes." She again testified that she did not recall if she spoke with anyone after the interviews or during breaks.

{¶ 19} Moore testified that she is not a licensed social worker, therapist or counselor and she has no medical training. According to Moore, the CAC "has medical and mental health providers there," but in this case "no medical referrals [were] made."

{¶ 20} Moore explained the reason law enforcement might request and observe a forensic interview: "[L]aw enforcement knows that we are required in child welfare to complete an interview. So it's attempting to reduce the amount of times that a child is interviewed. So it's not asking to do their job. It's about reducing trauma to the child." According to Moore, law enforcement does not "show up to every interview. They don't . . . even if they are involved."

{¶ 21} After the voir dire of Moore, the court found that "the forensic interviews were for purposes of assessing safety of the children and of the potential need for making referrals." The court ruled that "the State may play these interviews and the witness may testify."

## ii. Substantive Testimony

{¶ 22} Moore was called as a witness for the State before the jury. Asked to explain what a forensic interview is, Moore stated as follows: "A forensic interview is a non-leading interview where we discuss with children — well, we build a rapport with the child, and then a child tells us their story of any type of abuse and/or neglect or none if that has not happened." According to Moore, "it's important to be in a

neutral setting, somewhere a child feels comfortable and they feel safe to tell their story. Somewhere they can access any services that are needed." Asked what the "primary purpose" of the interviews was, Moore testified as follows: "In order to refer the family or just the child for mental health services and/or medical services, and if that's not possible, to engage the family in order to provide them services down the road."

{¶ 23} Moore testified that, in March 2022, she interviewed K.D. and C.J., who were alleged to have been sexually abused by Griffin. According to Moore, when CCDCFS receives a referral, they "attempt to make immediate contact with that child within 24 hours." Moore testified that this case involved "a non-emergency referral" and she went "out and ma[d]e contact with them just to assess their immediate safety for, you know, that specific day." Moore first went to "the home" but the family was "at the park down the street." Moore "went down to the park and met with the family real briefly." Moore testified that she met with Mother, K.D., and C.J. Moore and Mother "decided to complete a forensic interview at the [CAC] on a more appropriate day."

{¶ 24} Moore did, in fact, complete the forensic interviews of K.D. and C.J. at the CAC on March 23, 2022. Each interview was completed separately and no one else was in the room other than Moore and each child, individually. "When you first meet with a child for an interview, you build a rapport. You go over some ground rules, you check in with the child. You know, ask those basic safety questions in regards to home, their caretakers, that sort of thing."

{¶ 25} Moore authenticated the video recording of her interview with K.D., which was played for the jury. According to Moore, Johnson observed this video from another room. Moore testified that she spoke with Mother after K.D.'s interview to "see if they needed any type of service, that sort of thing." Moore further testified that she spoke with Mother "another time where she had sent me some [text] messages that were communicated through the family" from Griffin.

{¶ 26} According to Moore, as part of the job, she was required to attempt to speak with the alleged abuser. In this case, she attempted to speak with Griffin, but was unsuccessful. Subsequently, Moore determined that the case could be closed because "the family doesn't need any further services."

{¶ 27} Moore explained that when she closes a case she makes a "disposition." According to Moore, there are three different dispositions that she can "find" and she testified as follows about each one:

> Unsubstantiated, it doesn't necessarily mean that nothing happened, but it means that there was no disclosure of any type or there was no evidence that something took place.
>
> Indicated means that there is a disclosure of some sort and that, you know, most likely if it's indicated, you can't speak with all parties, or there isn't any evidence that something took place.
>
> And substantiated is when there is a credible disclosure, when there's other information that aligns with that disclosure, and/or if there is evidence that something did take place.

{¶ 28} Moore testified that the disposition of this case was "[s]ubstantiated."

{¶ 29} On cross-examination, Moore testified about the difference between a non-emergency referral and an emergency referral. "An emergency referral is

when a child has direct access to the alleged perpetrator at that moment. And a non-emergency referral, the child does not have known direct access. An emergency referral at that time, we'd have to go out within an hour. A non-emergency referral we go out within 24 hours." Moore testified that this case was a non-emergency referral. The case was opened on March 15, 2022 and was closed on May 10, 2022.

{¶ 30} Moore also testified that, after completing the initial meeting with Mother, C.J. and K.D. at the park on March 15, 2022, she determined that there were no "ongoing concerns" and no "immediate medical concerns." Moore scheduled the forensic interview for March 23, 2022 at the CAC. Asked what the purpose is for asking "non-leading, non-confrontational" questions, Moore answered, "It's more to assess what the child is saying to determine if that's something that could have happened or not happened, you know, or if the child is having a crisis of some sort that they would need a mental health provider in order for them to assess that." Moore testified that "there was no crisis at the time" in this case.

## III. Law and Analysis

### a. Evid.R. 803(4)

{¶ 31} In his first assignment of error, Griffin argues that the trial court erred by admitting into evidence the video of Moore's forensic interview with K.D.

{¶ 32} We review the admission or exclusion of evidence for an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a

matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 33} In his appellate brief, Griffin argues that *State v. Arnold*, 2010-Ohio-2742, applies to his case. Similar to this case, *Arnold* concerns statements that a child victim of sexual abuse made to a social worker during a forensic interview at a CAC. However, in *Arnold*, the child victim did not testify at trial, and Arnold argued that the admission of these statements violated the Confrontation Clause of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. The *Arnold* Court set forth the United States Supreme Court's holding in *Crawford v. Washington,* 541 U.S. 36 (2004), that "out-of-court statements violate the Sixth Amendment when they are testimonial and the defendant has had no opportunity to cross-examine the declarant." *Arnold* at ¶ 13, citing *Crawford* at 68.

{¶ 34} In *State v. Hall*, 2007-Ohio-3531, ¶ 19 (8th Dist.), this court held that "*Crawford* only applies when the declarant does not testify at trial." *See also Crawford* at 59, fn. 9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").

{¶ 35} In this case, K.D. testified at trial and was available for cross-examination. Accordingly, we conclude that *Arnold* has limited applicability to this case. *See State v. Simms*, 2012-Ohio-2321, ¶ 37 (10th Dist.) ("We begin our analysis by noting that we do not have a confrontation clause issue in the instant case, as [the

victim] testified at trial and was subject to cross-examination. Consequently, we believe *Arnold* has limited application to the instant case."). We turn to whether this video was admissible under the traditional rules against hearsay. *See State v. Jones*, 2012-Ohio-5677, ¶ 165 ("Having determined that [the out-of-court] statement . . . was not . . . barred by the Confrontation Clause, we must also now decide whether the statement was admissible under our rules of evidence.").

{¶ 36} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). Hearsay is not admissible at trial except as provided by a constitutional provision, statute or rule. Evid.R. 802.

{¶ 37} Evid.R. 803(4) states that the "following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."

{¶ 38} We return to *Arnold* for the limited purpose of determining whether statements a child victim made at a CAC forensic interview are considered "statements made for the purposes of medical diagnosis or treatment." We reiterate that the ultimate issue of admissibility in *Arnold* does not control the outcome of this case because *Arnold* was a Sixth Amendment Confrontation Clause challenge and not an analysis of hearsay under Evid.R. 803(4).

**{¶ 39}** The *Arnold* Court explained that CACs are "unique":

> Multidisciplinary teams cooperate so that the child is interviewed only once and will not have to retell the story multiple times . . . . [T]o ensure that the child victim goes through only one interview, the interviewer must elicit as much information from the child as possible in a single interview and must gather the information needed by each team member. Thus, the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim. The interviewer acts as an agent of each member of the multidisciplinary team.

*Id.* at ¶ 33.

**{¶ 40}** The *Arnold* Court categorized the statements made by the child victim at the CAC interview as follows:

> Certainly, some of the statements that [the child victim] made to [the social worker] primarily served a forensic or investigative purpose. Those statements include [the child victim's] assertion that Arnold shut and locked the bedroom door before raping her; her descriptions of where her mother and brother were while she was in the bedroom with Arnold, of Arnold's boxer shorts, of him removing them, and of what Arnold's "pee-pee" looked like; and her statement that Arnold removed her underwear. These statements likely were not necessary for medical diagnosis or treatment. Rather, they related primarily to the state's investigation. [The social worker] effectively acted as an agent of the police for the purpose of obtaining these statements.

*Id.* at ¶ 34.

> [O]ther statements provided information that was necessary to diagnose and medically treat [the child victim]. The history obtained during the interview is important for the doctor or nurse practitioner to make an accurate diagnosis and to determine what evaluation and treatment are necessary. For example, the nurse practitioner conducts a "head to toe" examination of all children, but only examines the genital area of patients who disclose sexual abuse. That portion of the exam is to identify any trauma or injury sustained during the alleged abuse.

[The child victim's] statements that described the acts that Arnold performed, including that Arnold touched her "pee-pee," that Arnold's "pee-pee" went inside her "pee-pee," that Arnold's "pee-pee" touched her "butt," that Arnold's hand touched her "pee-pee," and that Arnold's mouth touched her "pee-pee," were thus necessary for the proper medical diagnosis and treatment of [the child victim].

*Id.* at ¶ 37-38.

{¶ 41} In *State v. Fears*, 2017-Ohio-6978, ¶ 38 (8th Dist.), this court held that "[t]o the extent a victim's statement to a social worker is for investigative or prosecutorial purposes, the statement will not fall within the hearsay exception under Evid.R. 803(4)." In *State v. Flores*, 2024-Ohio-571, ¶ 28 (8th Dist.), this court noted that "case law from our court generally allows testimony from child advocacy workers relating to forensic interviews they conduct with allegedly sexually abused children when that testimony is for the purpose of medical diagnosis and treatment in accordance with Evid.R. 803(4)." In both *Fears* and *Flores*, the child victims testified at the defendants' trials. Thus, traditional hearsay rules govern.

{¶ 42} In *Fears*, a child sex abuse investigator with CCDCFS testified that the child victim "told her that 'her stepdad was touching her private parts' and that 'he was rubbing the part that sticks out of my private part.'" *Id.* at ¶ 16. The *Fears* Court found that "the statements made by [the child victim] to [the CCDCFS investigator] were made for the purposes of medical diagnosis and treatment as those statements were made as [the CCDCFS investigator] was endeavoring to determine whether sexual abuse was indicated, whether [the child victim] remained at risk, and whether [the child victim] would require treatment." *Id.* at ¶ 45. *See also In re D.L.,* 2005-

Ohio-2320, ¶ 21 (8th Dist.) ("[C]ourts have consistently found that a description of the encounter and identification of the perpetrator are within [the] scope of statements [made] for medical treatment and diagnosis.").

{¶ 43} In *Flores*, the court addressed "whether the state could play a video recording of the interview that the Florida social worker had with" the child victim. *Id*. at ¶ 15. In this video, which was played for the jury during trial, the child victim was "'talking about a couple of incidents [of] being touched inappropriately[.]'" *Id*. at ¶ 18. The *Flores* Court found that the video interview was admissible under Evid.R. 803(4) "because it was for medical diagnosis, treatment, and evaluating the safety/harm to" the child victim. *Id*. at ¶ 29.

{¶ 44} In *State v. Muttart*, 2007-Ohio-5267, ¶ 49, the Ohio Supreme Court set forth "a nonexhaustive list of considerations" courts may use when determining the purpose of a child victim's statements, including the following:

> (1) whether the child was questioned in a leading or suggestive manner[;] (2) whether there is a motive to fabricate, such as a pending legal proceeding such as a "bitter custody battle"[;] and (3) whether the child understood the need to tell the physician the truth . . . . In addition, the court may be guided by the age of the child making the statements, which might suggest the absence or presence of an ability to fabricate, and the consistency of her declarations . . . . In addition, the court should be aware of the manner in which a physician or other medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse.

{¶ 45} The *Muttart* Court further stated that a "defendant remains free to attack testifying witnesses' veracity and recollection, and a jury can assess those

claims and determine what weight, if any, to give the witnesses' testimony." *Id.* at ¶ 50.

{¶ 46} In light of this legal framework, we must examine K.D.'s statements in her forensic interview with Moore at the CAC to determine whether they were made for the purpose of medical diagnosis and treatment, thus rendering them admissible under Evid.R. 803(4).

{¶ 47} Our review of K.D.'s interview shows that, initially, Moore asked basic informational questions such as, "What is your name?" and "How old are you?" K.D. answered these preliminary questions. Moore then asked K.D. if she felt safe at her house and if she knew what "safe" meant. K.D. answered these questions by stating that yes, she felt safe, and "safe" meant that she was "not getting hurt or abused" and that she was not around people who made her feel uncomfortable. Moore next asked K.D. to tell her about a time when K.D. felt uncomfortable. K.D. said that Grandmother "had her boyfriend over for a date" and he offered to do word searches with K.D. K.D. talked about who was where in the house when this occurred, ultimately establishing that she and the "boyfriend" were alone in the dining room. K.D. said that was when he "started touching my butt," and this made her feel uncomfortable. K.D. also spoke for several minutes about the word searches although Moore did not ask K.D. any questions about them.

{¶ 48} Moore asked K.D. where on her "butt" the boyfriend touched her. K.D. stated that he touched the "right side" of her buttocks and "rubbed it." Moore next asked K.D. if this happened on top of the clothes or under them. K.D. stated

that this occurred "on top of" her clothes. Moore next asked K.D. to state what happened "from the very beginning to the end and don't leave out any details in between." K.D. reiterated what happened but did not reveal any new information relevant to the offenses at issue.

{¶ 49} It is undisputed that K.D.'s forensic interview occurred approximately one month after Griffin touched her buttocks area over her clothes and one week after Moore initially made contact with K.D. and determined that no medical emergency existed. Furthermore, by the time of the forensic interview, Moore had already established that Griffin, whose identity was never at issue in this case, no longer had access to K.D. at Grandmother's house.

{¶ 50} In determining what portion of K.D.'s statements to Moore were made for medical diagnosis or treatment, the Staff Notes to Evid.R. 803(4) are helpful:

> Statements made by declarant to a physician regarding present and past physical condition are admissible under this exception . . . . The circumstantial guaranty of trustworthiness of this exception is derived from the assumption that a person will be truthful about his physical condition to a physician because of the risk of harmful treatment resulting from untruthful statements . . . . The exception is limited to those statements made by the patient which are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted.

{¶ 51} In *State v. Jeffries*, 2018-Ohio-5039, ¶ 22 (8th Dist.) (S. Gallagher, J., concurring) the concurring opinion stated, in part, as follows: "Evid.R. 803(4) has become a gateway to introducing the specific details of abuse necessary to support a conviction. There are no safeguards against use of the rule to bolster an alleged victim's testimony or to aid the prosecution in obtaining a criminal conviction." In

*Jeffries*, the testifying witness "was not a medical professional, but the child protection specialist who interviewed the victim." *Id*. at ¶ 23. The *Jeffries* concurring opinion further stated that this hearsay "testimony is permitted under the ambit of having been made for purposes of medical diagnosis or treatment, even though Evid.R. 803(4) never contemplated the introduction of the explicit details of a crime relayed to a social worker interviewing the victim." *Id*. at ¶ 24. The position taken in this concurring opinion is supported by the Staff Notes to Evid.R. 803(4), which contemplate that the rule applies to statements made by a "patient" to a "physician."

{¶ 52} Upon review, we find that some of K.D.'s statements had nothing to do with medical diagnosis or treatment. Moore is not a medical professional, the interview did not occur at a medical facility or in a medical setting, none of K.D.'s statements concerned a present or past medical condition and it is unlikely that K.D. needed medical diagnosis or treatment for physical injuries, sexually transmitted diseases or pregnancy. Certainly, however, one of the purposes of this interview could have been to assess whether K.D. needed medical treatment or diagnosis for mental-health issues. *See State v. O.E.P.-T.,* 2023-Ohio-2035, ¶ 170 (10th Dist.) ("The term 'medical diagnosis' in Evid.R. 803(4) includes a mental health diagnosis.").

{¶ 53} We are mindful that in many instances of sexual abuse allegations, medical diagnosis and treatment are a larger part of the forensic interview than in this case. For example, in *State v. L.E.F.,* 2014-Ohio-4585, ¶ 4, 8 (10th Dist.), the

"medical forensic interviewer . . . testified that when a child comes into the [CAC], the center asks the child's medical background and gets the child's weight, height, and temperature." The interviewer in *L.E.F.* further testified that "at every interview of a child, either a physician or nurse practitioner observes the interview, and [the interviewer] always meets with the physician or nurse immediately following the interview to discuss the matter." *Id.* at ¶ 8. This interviewer "also testified that the interview guides the course of the medical exam, which immediately follows the interview." *Id.* The forensic interview in *L.E.F.* was vastly different than the forensic interview in this case. K.D.'s medical background, weight, height and temperature were never discussed. No one from the medical profession observed K.D.'s interview, and Moore did not testify that she met with anyone from the medical profession to discuss K.D.'s case. Nothing in the record suggests that K.D. was given a medical examination following her interview.

{¶ 54} Even assuming that some of K.D.'s statements were inadmissible under Evid.R. 803(4), we find any error that may have occurred was harmless, because these statements were cumulative of properly admitted evidence, specifically, K.D.'s testimony at Griffin's trial. *See* Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."); *State v. Williams*, 38 Ohio St.3d 346, 350 (1988) (holding that the admission of a hearsay statement was harmless because the "contents of the statement were largely cumulative of the testimony of other witnesses at . . . trial. Additionally, it is clear that had [the hearsay] statement been properly excluded, the

remaining evidence constituted overwhelming proof of [the defendant's] guilt.").
Our review of the record shows that the statements K.D. made to Moore in the
interview about Griffin touching her were substantially similar to K.D.'s testimony
at Griffin's trial. Thus, we cannot say that the trial court abused its discretion by
allowing the State to play the video during the trial.

{¶ 55} Accordingly, Griffin's first assignment of error is overruled.

### b. Social Worker's Testimony that the Victim's Disclosures Were Credible

{¶ 56} In Griffin's second assignment of error, he argues that the court
improperly allowed Moore "to testify that the disclosures of [K.D.] were credible."
Specifically, Griffin argues that Moore "told the jury that the prosecution's case was
'substantiated'" and further "explained to the jury that 'substantiated' means that a
victim is telling the truth."

{¶ 57} First, we clarify that Moore testified that CCDCFS's investigation was
substantiated. By agreement of the parties, the court instructed the jury
immediately after Moore's testimony and separate from the remainder of the jury
instructions, as follows:

> I have a limiting instruction for you to guide you in your deliberations.
> You have received testimony from the State's witness, Stephanie
> Moore, that allegations of sexual abuse were substantiated by the
> [CCDCFS].
>
> The Court instructs you that this testimony and finding is merely
> reflective of that agency's policy of classification of child abuse cases,
> and not an assessment of the alleged victim's credibility. Therefore, the
> Court instructs you that any such findings that may have been made
> should have no bearing on your independent fact-finding function in

this case and specifically should have no bearing on the ultimate issue at trial, which is whether defendant abused the alleged victims.

{¶ 58} To support his argument, Griffin cites *State v. Boston*, 46 Ohio St.3d 108, 129 (1986), in which the Ohio Supreme Court held that "an expert [witness] may not testify as to the expert's opinion of the veracity of the statements of a child declarant."

{¶ 59} Moore did not testify as an expert witness in this case. Nonetheless, this court has "repeatedly recognized that a social worker's interdepartmental determination of an allegation of abuse — such as unsubstantiated, substantiated, or indicated — is acceptable, provided that the social worker does not testify as to the truthfulness or credibility of the alleged victim." *State v. Jackson*, 2010-Ohio-3080, ¶ 17 (8th Dist.). *See also State v. Ferrell*, 2015-Ohio-1446, ¶ 15-16 (8th Dist.); *State v. Murphy*, 2019-Ohio-4347, ¶ 57 (8th Dist.).

{¶ 60} Upon review, we find that Moore testified about the "interdepartmental determination" that the allegations of sexual abuse in this case were substantiated. Moore explained the meaning of the three different "interdepartmental determinations" that CCDCFS uses. Specifically, Moore testified that the definition of "substantiated" included the word "credible." Moore did not express an opinion about whether K.D. was "credible." Furthermore, as noted, the court gave the jury a limiting instruction after Moore's testimony, admonishing them that this is "not an assessment of the alleged victim's credibility." Therefore, the trial court did not abuse its discretion by allowing Moore to testify

about the results of the CCDCFS investigation in this case. *See State v. Williams*, 2023-Ohio-1748, ¶ 16-17 (8th Dist.) ("A social worker may testify concerning the children service agency's disposition of an allegation of abuse . . . . Only the outcome of the investigation is admissible at trial.")

{¶ 61} Accordingly, Griffin's second assignment of error is overruled.

### c. Cumulative-Error Doctrine

{¶ 62} In Griffin's third and final assignment of error, he argues that "[u]nder the cumulative error doctrine, a conviction should be reversed where the cumulative effect of errors deprives a defendant of the constitutional right to a fair trial even though the errors when viewed individually may not constitute cause for reversal."

{¶ 63} In *State v. Garner*, 74 Ohio St.3d 49, 64 (1995), the Ohio Supreme Court stated that the cumulative-error "doctrine is not applicable to the case at bar as we do not find multiple instances of harmless error." In following *Garner*, we find the same thing here.

{¶ 64} Accordingly, Griffin's third assignment of error is overruled.

{¶ 65} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

MICHAEL JOHN RYAN, J., and
DEENA R. CALABRESE, J., CONCUR