[Cite as *State v. Hutchinson*, 2025-Ohio-4674.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                     :

                                        No. 114781

    v.                                                  :

JAMES HUTCHINSON,                            :

    Defendant-Appellant.                   :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 9, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-690885-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Samantha M. Sohl, Assistant Prosecuting Attorney, *for appellee*.

Wegman Hessler Valore, Dean Valore, and Matthew O. Williams, *for appellant*.

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant James Hutchinson ("Hutchinson") appeals his convictions and claims the following errors:

1. The trial court erred in admitting hearsay statements from B.R.'s forensic interview which served no medical purpose and were clearly testimonial.

2. The court's verdicts of "Guilty" on all four counts are against the manifest weight of the evidence.

{¶ 2} After careful review of the evidence, we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 3} Hutchinson was charged with two counts of rape in violation of R.C. 2907.02(A)(1)(b), one count of attempted rape in violation of R.C. 2907.02(A)(1)(b), and one count of gross sexual imposition in violation of R.C. 2907.05(A)(4). The two rape counts included furthermore clauses alleging that the victim was a child under ten years of age. The attempted-rape count included the same furthermore clause and an attempted-rape specification alleging the attempted rape of a child under ten years of age. The gross-sexual-imposition count alleged that Hutchinson engaged in sexual contact with a minor, who was less than 13 years of age whether or not he knew the victim's age.

{¶ 4} Hutchinson waived his Sixth Amendment right to a jury trial, and the case was tried to the bench. M.W. testified that she is the mother of B.R., the victim identified in all four counts of the indictment. M.W. explained that in November 2023, she began to suspect that B.R. was talking to men of all ages and that she wanted to "keep an eye on her." (Tr. 134.) In an apparent effort to help their mother, B.R.'s older brothers reviewed the contents of B.R.'s phone and they found some inappropriate messages from someone on Facebook. M.W. found the person's

Facebook profile and discovered the messages were coming from Martreal Pryor ("Pryor"), B.R.'s babysitter.

{¶ 5} M.W. and B.R.'s father confronted Pryor about the messages, and he denied having sent them. He nevertheless fled from the home through a bathroom window and was subsequently prosecuted for sex crimes committed against B.R. in a separate case.

{¶ 6} In talking with B.R., M.W. learned that Pryor had sexually assaulted her. M.W. took B.R. to Lutheran Hospital for a sexual-assault examination, but the sexual-assault nurse examiner ("SANE") was not there. She took B.R. to University Hospitals Rainbow Babies and Children's Hospital ("U.H.") the following day, and at that time, B.R. disclosed to the SANE nurse there that she had also been sexually assaulted by Hutchinson, whom B.R. knew as "D Man." (Tr. 139-141.)

{¶ 7} M.W. testified that she and D Man dated from 2018 until they broke up in April 2022. Hutchinson lived with M.W. and her children during that time period. M.W. worked nights as a home health aide, and Hutchinson babysat B.R. while she was at work. (Tr. 147.)

{¶ 8} M.W. was suspicious of Hutchinson before they broke up because she found him in bed with B.R. in February 2022. (Tr. 150.) M.W. asked B.R. if anything had happened with Hutchinson, and B.R. replied "No." However, B.R.'s behavior indicated something was wrong because "she couldn't regulate her emotions." (Tr. 154.)

{¶ 9} Tammy Thomas ("Thomas"), a behavior-health specialist at Ohio Guidestone, began counseling B.R. in 2020. (Tr. 192.) Thomas testified she was scheduled to appear for an in-home counseling session with B.R. in November 2023 when M.W. called to advise her that they had to miss the appointment because they were at U.H. for a sexual-assault examination. B.R. had not told Thomas about any sexual abuse.

{¶ 10} B.R. was born in September 2013, and she was 11 years old at the time of trial in July 2024. (Tr. 131.) She testified that when she was in third and fourth grade, Hutchinson routinely asked her to go in the bathroom "to suck his thing," which she confirmed meant his penis. (Tr. 227.) When asked if anything came out of Hutchinson's penis, B.R. replied "cum," which she described as "white." (Tr. 229.) She testified that Hutchinson's "cum" would go all over her face and he would wipe it off with a wet rag. (Tr. 230.) B.R. also stated that while Hutchinson's penis was in her mouth, Hutchinson would put his hands "in [her] butt" under her clothes. (Tr. 231 and 236.)

{¶ 11} The prosecutor asked B.R. if Hutchinson ever tried to put anything in her vagina, and she replied, "Yes . . . He tried to put his private part inside." (Tr. 237.) The prosecutor asked if it hurt, and B.R. replied, "It never went in. He was trying to." (Tr. 237.) When asked why it did not go in, B.R. explained that "I beg him not to." (Tr. 237.) However, B.R. further stated that Hutchinson "put his tongue" on her vagina. (Tr. 233-234.) Hutchinson did this multiple times on the couch and in her mother's bedroom while her mother was at work and everyone else

was asleep. (Tr. 234.) According to B.R., these sexual acts occurred "a lot" when she was in fourth grade. (Tr. 236.) Hutchinson stopped assaulting B.R. when he and her mother broke up and he moved out of their apartment. (Tr. 242.)

{¶ 12} B.R. never told anyone about the sexual abuse because she was "too afraid" and because she did not want to worry her mother or her brothers. (Tr. 238.) She was also "scared of getting in trouble." (Tr. 239.) When asked if anyone told B.R. what to say in court, she replied, "My mom just told me just be brave and say what happened." (Tr. 242.)

{¶ 13} Ada Jackson ("Jackson") was employed as a sex-abuse intake worker at the Cuyahoga County Division of Children and Family Services ("CCDCFS") at the time B.R. disclosed her sexual abuse. (Tr. 288.) Jackson testified that she routinely interviews child victims of alleged sexual assault to determine if sexual abuse has in fact occurred, to assess the victim's safety, and to refer the victim for medical or mental-health services, if needed. (Tr. 289.) Jackson explained that her investigative procedure requires her to render a final disposition of either unsubstantiated, indicated, or substantiated depending on the results of the investigation.

{¶ 14} Jackson conducted two forensic interviews of B.R. at the Child Advocacy Center. During the first interview, B.R. discussed sexual-assault allegations involving Pryor. The second interview became necessary because B.R. disclosed additional abuse involving Hutchinson. The forensic interviews were recorded, and the second interview, which was marked as State's exhibit No. 23, was

admitted into evidence over defense counsel's objection. After completing her investigation of B.R.'s allegations, Jackson concluded that B.R.'s allegations of sexual abuse were substantiated, meaning "there was enough evidence or information provided to substantiate whatever the disclosure was made by the parties." (Tr. 295.)

{¶ 15} Jackson testified that the purpose of her forensic interviews was "[t]o get the child's side of the story regarding the allegations that are reported." (Tr. 315.) Defense counsel repeatedly asked Jackson if she knew that her interviews would be turned over to law enforcement, and Jackson repeatedly answered that she was not involved in law enforcement and that she was solely concerned with assessing the safety and treatment needs of the child. (Tr. 315-316.) She denied knowing how law enforcement obtained copies of the forensic interviews. (Tr. 315.)

{¶ 16} Lieutenant Ashley Jaycox ("Lt. Jaycox) is a detective with the Cuyahoga Metropolitan Housing Authority ("CMHA") in charge of investigating sex crimes allegedly committed against child victims on CMHA property. Jaycox admitted she observed Jackson's first forensic interview of B.R. from a separate observation room. (Tr. 369.) When asked why she was present during the interview, Lt. Jaycox replied, "[I]f there's any other further questions that we may need, I will ask [Jackson] to ask those questions if we need them for our investigation." (Tr. 370.) Jaycox was not present for the second interview because she was not available. (Tr. 370.) And, although Jackson was present for the first interview, she did not recall asking any questions. (Tr. 381.)

{¶ 17} Finally, Kathleen Hackett ("Hackett"), a SANE nurse and pediatric-forensic-program coordinator at UH, testified that she examined B.R. and took a "medical assault history" from her. Hackett explained that the medical-assault history "help[s] guide the medical care" and helps her determine if medical testing for sexually transmitted diseases is necessary. (Tr. 332 and 334.) Hackett explained that she initially examined B.R. due to allegations involving only Pryor. However, when she asked B.R. if anyone else had ever done something to her body that she did not like, B.R. revealed that "D Man did." (Tr. 347.) Hackett asked, "What did D Man do?" and B.R. replied, "He made me suck his thing." (Tr. 347.)

{¶ 18} Based on the evidence presented, the court found Hutchinson guilty of two counts of rape, one count of attempted rape, and one count of gross sexual imposition as alleged in the indictment. The court sentenced Hutchinson to life sentences with possibility of parole after 15 years on each of the rape and attempted-rape convictions. The court also sentenced Hutchinson to 60 months on the gross-sexual-imposition convictions. All the sentences were ordered to be served concurrently to each other. Hutchinson now appeals his convictions.

## II. Law and Analysis

### A. Forensic Interview

{¶ 19} In the first assignment of error, Hutchinson argues the trial court erred in allowing the forensic interview that was admitted into evidence as State's exhibit No. 23. He contends the statements contained in the second interview were not necessary for purposes of medical diagnosis and treatment or for assessing

B.R.'s safety. He contends the statements in the second interview served only investigatory purposes and that they, therefore, constitute inadmissible hearsay.

{¶ 20} "The admission of evidence lies within the broad discretion of a trial court, and a reviewing court [will] not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice." *State v. Noling*, 2002-Ohio-7044, ¶ 43. An abuse of discretion occurs when the trial court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 21} However, "a trial 'court does not have discretion to misapply the law.'" *Morgan v. Greater Cleveland Regional Transit Auth.*, 2025-Ohio-1655, ¶ 64, quoting *Johnson* at ¶ 38. "Thus, an abuse of discretion also occurs when a court "'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.'"" *Id.*, quoting *Thomas v. Cleveland*, 2008-Ohio-1720, ¶ 15 (8th Dist.), quoting *Berger v. Mayfield*, 265 F.3d 399 (6th Cir. 2001).

{¶ 22} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted in the statement." Under Evid.R. 802, hearsay is inadmissible unless the out-of-court statement falls within a recognized exception to the hearsay rule. Evid.R. 803 sets forth several exceptions including Evid.R. 803(4), which provides an exception for statements made for purposes of medical diagnosis and treatment. Evid.R. 803(4) provides:

Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character or the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

{¶ 23} Hutchinson cites *State v. Arnold*, 2010-Ohio-2742, in support of his claim that Jackson's second forensic interview of B.R. contains nothing but inadmissible hearsay. In *Arnold*, the Ohio Supreme Court considered whether a child's hearsay statements contained in a forensic interview violated the Confrontation Clause of the Ohio and United States Constitutions. Because B.R. testified at trial, the Confrontation Clause was not implicated and the *Arnold* decision has limited application in this case. *State v. Griffin*, 2025-Ohio-1459, ¶ 34-35, and 38 (8th Dist.), citing *Crawford v. Washington*, 541 U.S. 36, 59, fn. 9 (2004) ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").

{¶ 24} Nevertheless, *Arnold* is relevant for determining whether the statements B.R. expressed during the forensic interview were made for purposes of medical diagnosis or treatment. In *Arnold*, the Court explained that child-advocacy centers are unique because they involve interdisciplinary teams of people who cooperate "so that the child is interviewed only once and will not have to retell the story multiple times." *Id.* at ¶ 33. "Most members of the team retain their autonomy" such that "[n]either police officers nor medical personnel become agents of the other." *Id.* However, to avoid the need for multiple interviews, "the

interviewer must elicit as much information from the child as possible in a single interview and must gather the information needed by each team member." *Id.*

> Thus, the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim. The interviewer acts as an agent of each member of the multidisciplinary team.

*Id.* As a result, some of the child's statements may serve an investigative purpose while other statements will be elicited for purposes of medical diagnosis or treatment. *Id.* at ¶ 34. In *State v. Fears*, 2017-Ohio-6978, ¶ 38 (8th Dist.), this court held that "[t]o the extent a victim's statement to a social worker is for investigative or prosecutorial purposes, the statement will not fall within the hearsay exception under Evid.R. 803(4)." *Id.* at ¶ 38, citing *State v. Rose*, 2012-Ohio-5607, ¶ 42 (12th Dist.).

{¶ 25} In *Arnold*, the Court held that statements about shutting and locking the door to the room before raping the victim and descriptions about the defendant's clothing before they were removed were solely meant for investigative purposes and were not made for purposes of medical diagnosis or treatment. *Id.* at ¶ 34. However, courts have held that descriptions of sexual abuse itself and the identification of the perpetrator are within the scope of statements made for medical and treatment purposes when the interviewer is seeking to determine if the sexual abuse was indicated, whether the child victim remained at risk, and whether the child victim requires treatment. *Griffin* at ¶ 42, citing *Fears* at ¶ 45; *In re D.L.*, 2005-Ohio-2320, ¶ 21 (8th Dist.) ("[C]ourts have consistently found that a description of the

encounter and identification of the perpetrator are within [the] scope of statements [made] for medical treatment and diagnosis.").

{¶ 26} In *State v. Muttart*, 2007-Ohio-5267, the Ohio Supreme Court set forth "a nonexhaustive list of considerations" courts may apply when determining the purpose of a child victim's statements. These considerations include

> (1) whether the child was questioned in a leading or suggestive manner[;] (2) whether there is a motive to fabricate, such as a pending legal proceeding such as a "bitter custody battle"[;] and (3) whether the child understood the need to tell the physician the truth . . . . In addition, the court may be guided by the age of the child making the statements, which might suggest the absence or presence of an ability to fabricate, and the consistency of her declarations . . . . In addition, the court should be aware of the manner in which a physician or other medical provider elicited or pursued a disclosure of abuse by a child victim, as shown by evidence of the proper protocol for interviewing children alleging sexual abuse.

(Citations omitted.) *Id.* at ¶ 49. The *Muttart* Court further observed that a "defendant remains free to attack testifying witnesses' veracity and recollection, and a jury can assess those claims and determine what weight, if any, to give the witnesses' testimony." *Id.* at ¶ 50.

{¶ 27} When Jackson met B.R. for the second interview, B.R. volunteered, without being asked, that she forgot to tell Jackson "about the other guy." (State's exhibit No. 23.) Jackson replied, "Ok, well, what?" (State's exhibit No. 23.) B.R. then disclosed that her mother's "ex," whom she identified as "D Man," used to do things to her. Jackson asked "What did he used to do to you?" (State's exhibit No. 23.) B.R. replied that he used to "touch me under" when she was nine and ten years old. (State's exhibit No. 23.) Jackson asked, where B.R.'s mother was when this

happened, and B.R. told her that her mother was at work. Jackson asked, "When did it stop?" and B.R. replied, "When they broke up." (State's exhibit No. 23.)

{¶ 28} When Jackson asked B.R. to describe specifically what D Man did to her, B.R. was uncomfortable talking about it. Therefore, Jackson gave her anatomical drawings to make it easier for B.R. to explain what parts of their bodies were involved and how the sexual acts were committed. As B.R. explained the acts of abuse, Jackson asked B.R. if anything ever came out of Hutchinson's penis. (State's exhibit No. 23.) Jackson also asked if Hutchinson ever put anything inside her body, if he ever hit her, whether Hutchinson ever used a gun or weapon, and whether B.R. ever attempted to escape. (State's exhibit No. 23.)

{¶ 29} Jackson's questions were clearly intended to assess B.R.'s safety and to evaluate any potential medical or mental-health issues in light of the new information she was providing. Indeed, near the end of the interview, Jackson explained to B.R. that she could discuss her feelings about the abuse in counseling. (State's exhibit No. 23.) Despite Hutchinson's statements to the contrary, Jackson never used leading questions to suggest ideas to B.R. Jackson allowed B.R. to initiate the disclosure of information before asking follow-up questions specifically related to the information B.R. had initially provided.

{¶ 30} Jackson testified that at the time she interviewed B.R., she was working as a sex-abuse intake worker at CCDCFS and that the interview was conducted solely for the purposes of assessing B.R.'s safety and to determine if she needed medical or mental-health services. Although Lt. Jaycox observed the first

interview, which is not an issue in this case, Lt. Jaycox was not present for the second interview because she was unavailable. Therefore, Hutchinson's argument that the second interview served only an investigatory purpose is belied by the evidence.

{¶ 31} Although some of the questions and answers regarding the specific acts of abuse and the identity of the perpetrator could be used for criminal prosecution, there is no evidence that Jackson conducted the interview solely for that purpose. And, as previously stated, statements describing the abuse and identifying the perpetrator are considered within the scope of treatment when the interviewer is seeking to determine if the abuse is indicated or if the child remained at risk. *Griffin*, 2025-Ohio-1459, at ¶ 42, citing *Fears*, 2017-Ohio-6978, at ¶ 45; *In re D.L.*, 2005-Ohio-2320, at ¶ 21.

{¶ 32} Furthermore, the statements in the second forensic interview were cumulative to other evidence. Even if portions of the interview were admitted in error, the admission of the evidence was harmless because the interview was introduced in a bench trial and, in a bench trial, judges are presumed to know the law and consider only material, admissible evidence. *State v. Thomas*, 2002-Ohio-6624, ¶ 57, citing *State v. Post*, 32 Ohio St.3d 380 (1987); *State v. Primous*, 2020-Ohio-912, ¶ 60 (8th Dist.), citing *State v. Bays*, 87 Ohio St.3d 15, 27 (1999).

{¶ 33} The first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 34} In the second assignment of error, Hutchinson argues his convictions are against the manifest weight of the evidence.

{¶ 35} In determining whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In our manifest-weight review of a bench trial verdict, we recognize that the trial court serves as the factfinder and not a jury. *State v. Crenshaw*, 2020-Ohio-4922, ¶ 23 (8th Dist.). To warrant reversal from a bench trial under a manifest-weight-of-the-evidence claim, this court must determine that "the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered." *Id.* "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which evidence weighs heavily against conviction.'" *Id.* at ¶ 24, quoting *Thompkins* at 387.

{¶ 36} Hutchinson does not dispute the fact that there is sufficient evidence to support each of his convictions. He contends his convictions are against the manifest weight of the evidence because there was no physical evidence corroborating B.R.'s testimony and because B.R. admitted she confused the acts Pryor committed against her with the acts that Hutchinson committed against her. Hutchinson also asserts that B.R. was motivated to deflect blame from Pryor, whom B.R. called "My Love" on her cell phone. And, Hutchinson argues that B.R. was coached.

{¶ 37} However, B.R.'s trial testimony was consistent with the statements she made to Jackson almost a year earlier in the second forensic interview. Such consistency is remarkable for a child who was only 11 years old at the time of trial. It is also a sign of truth telling. Although B.R. had Pryor labeled as "My Love" on her phone, there is no evidence in the record indicating that she had fond feelings for him. As for being coached, B.R. testified that her mother essentially instructed her to "be brave" and tell the truth. (Tr. 242.) Moreover, after viewing State's exhibit No. 23, the second forensic interview, it is clear that B.R. was not led to make false accusations. To the contrary, her statements to Jackson were very credible. We, therefore, cannot say that the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

{¶ 38} The second assignment of error is overruled.

{¶ 39} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
DEENA R. CALABRESE, J., CONCUR